## MONK *et ux.* v. McDANIEL.

1. Where a father in a letter to his sister-in-law requested that, in the event of his death, she would take and keep his child, and she, in response to such request, wrote him that in case of his death she would take the child and care for it until she could get it a good home, this correspondence did not, in the absence of an acceptance by the father of his sister-in-law's offer, give her, after his death, the legal custody and control of the child.

2. One who legally adopts a child has the right to its custody and control, and an agreement to relinquish the same must, in order to be enforceable, be clearly established by evidence and also be distinct and unequivocal in its terms.

3. An answer to an offer will not amount to an acceptance, so as to result in a contract, unless it be unconditional and identical with the terms of the offer.

4. While the judge upon the hearing of a writ of habeas corpus for the detention of a child is vested with a discretion in determining to whom its custody shall be given, such discretion should be governed by the rules of law and be exercised in favor of the party having the legal right, unless the evidence shows that the interest and welfare of the child justify the judge in awarding its custody to another.

5. Irrespective of other rulings complained of in the present bill of exceptions, the case, upon the facts disclosed by the record, is controlled by the legal propositions announced above, and applying the same results in a reversal of the judgment. LITTLE, J., dissenting.

Submitted June 25, — Decided August 7, 1902.

Habeas corpus. Before Judge Harris. Carroll superior court. April 29, 1902.

*Brown & Roop*, for plaintiffs.
*W. D. Hamrick* and *J. E. Smith*, for defendant.

FISH, J.  This was a proceeding by habeas corpus, brought by
W. F. Monk and his wife, Minnie Monk, against Sarah A. McDan-
iel, for the custody of Ethel Monk, formerly Ethel Coker, a child
between four and five years of age.  The judge of the superior court,
upon the hearing, awarded the child to the defendant; whereupon
the plaintiffs excepted.  It appears from the record that Ethel is
the daughter of John and Virginia Coker, who, until their respec-
tive deaths, resided in Henry county, Alabama; and that John, who
survived his wife, died about February, 1900.  The record shows
that on September 8, 1900, the plaintiffs, in the probate court of
Barbour county, Ala., and in accordance with the laws of that State,
adopted Ethel as their child, having her name changed to Monk,
and that her grandfather, Thomas Coker, and her aunt, Mrs. Mc-
Craney, consented to the adoption.  Plaintiffs based their right to
the custody of the child upon this adoption.

1. One of the contentions of the defendant was, that she was en-
titled to the custody of the child, because the child's father had
given her to Mrs. Price, who, in October, 1900, had given her to
the defendant.  It appeared that John Coker, about two weeks af-
ter his wife's death, and some four months before he died, wrote a
letter to Mrs. Price, a sister of Ethel's mother, in which he used
the following language : " My health is not very good no way, and
I may not live very long, and if I should not, I don't know what
would become of the children.  I know that you have got your
hands full, but if anything was to happen I want you to take Dudley
and Ethel, if possible, and N. W. Vinson Fay, or [if ?] it suited you
and you could keep her with them that would be all right; maybe I
would leave enough to help them along some, and of course I would
expect you to take that."  Mrs. Price, who resided in Henry county,
Ala., testified by interrogatories as follows: " In reply to said letter
I wrote said John Coker that I would, in case of his death, take
said children and take care of them until I could get them a good
home.  I accepted said trust, but afterwards delegated the same to
Sarah A. McDaniel, in consideration that she would take said chil-
dren and raise them as her own, and to clothe, maintain, and ed-
ucate them."  It appeared that immediately after the death of her
father Ethel was taken to the home of Mrs. Price, where she re-
mained only one night, and was then taken to Barbour county, Ala.,
to her grandfather, Thomas Coker, and her aunt, Mrs. McCraney,

by permission of Mrs. Price, to remain until she could arrange to get her a suitable home. Coker's desire, as expressed in his letter to Mrs. Price, evidently was that, in the event of his death, she should take and rear his children. To this it is clear she never assented, but in reply wrote, in substance, that she would care for them until she could get them a good home with some other person. He never agreed, so far as the record shows, that she might take the children for the purpose indicated in her reply. Although she met him upon four different occasions after she wrote to him, three of them being when he was at her home with the children, it does not appear that anything more was said as to her taking them. It is, therefore, apparent that Coker and Mrs. Price never had the same common intention as to the purpose for which she should take his children; there was no meeting of their minds on this subject; and it necessarily follows that Mrs. Price's evidence fails to show that any agreement was entered into between her and Coker, whereby she acquired the right to the custody of the children after his death. This being true, of course she could not confer any right as to their custody upon the defendant, especially as against the claim of the plaintiffs, who had previously regularly adopted Ethel. Mrs. Price's testimony to the effect that she "accepted said trust" was merely her conclusion.

2. The defendant further claimed that the plaintiffs relinquished to her their right to the custody and control of Ethel after they adopted her. Mrs. Hearn was the only witness examined in reference to this feature of the case. She testified as follows: "That Ethel was a second cousin of hers and her sister, Miss Sarah A. McDaniel; that in June, 1901, she went to Clayton, Ala., to plaintiffs about Ethel; that she and defendant had already gotten her little brother, Dudley, who was just about two years older than Ethel, and wanted to get Ethel also; that she saw plaintiffs and told them what she wanted, and also told them that she thought it best for the children to be raised together, and the plaintiffs said they thought so, too; that she had had some correspondence with plaintiffs about Ethel before, and had written them that she was coming to see about getting her; that at first plaintiffs did not seem to be willing to give up Ethel; that she told them that they could have their adoption papers canceled, and that she would pay all costs thereof; plaintiffs agreed to let her and defendant have Ethel if she was sat-

isfied to stay with them; that at that time Mrs. Strickland, a relative of plaintiffs, was present and they all said that it was right, that Ethel and Dudley ought to be raised together, and she took her with the distinct understanding that she and defendant were to keep her unless she became dissatisfied; that Mr. Monk said the probate judge was out of town, and when he returned he would have the adoption papers canceled; witness was at that time single, and defendant intended to adopt Ethel and Dudley; that Ethel seemed to be happy and contented with her and defendant; that when anything was said to her about going back to plaintiffs, she would say she did not want to go." Plaintiffs introduced the following letter from Mrs. Hearn to Mrs. Monk, dated July 11, 1901: "I have consulted one of the best lawyers in your State; and he says that if you and your husband decide to cancel the adoption papers, the process is simple and inexpensive. You have only to annul the decree heretofore rendered by the judge of probate of Barbour county. And we would proceed under the laws of Georgia in our adoption proceeding. I trust that you have reached the conclusion that this is the best course to pursue. If so, just send me bill of costs, and I will forward you check for the same. Ethel I am sure will always love you both for your loving care bestowed upon her, and I believe above all things else that you have not allowed her to be separated from her little brother." Plaintiffs also put in evidence a letter from Mrs. Hearn to Mrs. Monk, dated Nov. 15, 1901, as follows: "Yours of recent date received. I am very busily employed now between my affairs at Victory and housekeeping at Carrollton, but I will try to get off in December and take Ethel to see you, if you think after a few days you would consent to let her come back with me, and you will relinquish your papers." We do not think that Mrs. Hearn's testimony, as a whole, was sufficiently clear and definite to authorize a finding that plaintiffs entered into a contract with her by which they agreed to permanently relinquish to her their right to the custody and control of their adopted child. Of course, adoptive parents are as much entitled to the custody of their adopted child as are natural parents to their children, and, as was held in *Miller* v. *Wallace*, 76 *Ga.* 479, "Where it is insisted that the father has relinquished his right to the custody of his child to a third person by contract, the terms of the contract, to have the effect of depriving him of his control, should be

clear, definite, and certain." While it is true that Mrs. Hearn tes-
tified that she took Ethel with the distinct understanding that she
and the defendant were to keep her, unless she became dissatisfied,
and that she had never become so, yet it does not affirmatively and
distinctly appear that such was the understanding on the part of
the plaintiffs. From Mrs. Hearn's testimony it appears that the
agreement was executory in character — that is, that plaintiffs were
to have "their adoption papers canceled" before giving up their right
to the child's custody; and it appears that this was never done.
Mrs. Hearn's letters show that she still recognized plaintiffs' right
to the child after she had brought her to Georgia in pursuance of
the alleged contract.

3. Another contention of the defendant was that Mr. Monk, in
January, 1902, entered into a contract with Mrs. Hearn, by which
he agreed to relinquish to her and the defendant the custody of the
child. The only evidence submitted in support of this contention
was as follows: Mrs. Hearn testified, in substance, that Monk came
to Carrollton, in January, 1902, after the child; that witness and
the defendant declined to give her up; that the child did not wish
to go with him; that he said if witness and defendant would pay
him fifty dollars — that being about the amount that he had ex-
pended on the child's account,— he would let them keep her; that
witness agreed to do this and told him, "if he would have his adop-
tion papers of Ethel canceled and forward them to the Carrollton
bank, she would instruct the bank to pay him the fifty dollars;"
that this was on Sunday, and the next week she did instruct the
cashier of said bank to pay Mr. Monk the fifty dollars when
said papers were sent to the bank thus canceled, and wrote Mr.
Monk accepting his proposition; that she would have accepted his
proposition the day it was made, but did not want to make a trade
on Sunday. A letter from Mrs. Hearn to Mr. Monk, dated Feb.
21, 1902, was as follows: "My sister and I accepted your propo-
sition. The money is now in the Carrollton bank, and has been all
the while ready for you when you send in the papers as you said
you would. This the second time I have notified you." A letter
from Mr. Monk to the cashier of the Carrollton bank was put in
evidence by the defendant. It was as follows: "Mrs. Ella Hearn
wrote me a few days ago that she had deposited $50 in the bank
for you to give me when I notify you of the cancelation of my

adoption of a little girl. If such is the case and you have the money to send to me on such notice, please let me know by return mail." We gather from this evidence, that Monk proposed to Mrs. Hearn that, if she and the defendant would pay him fifty dollars, he would relinquish to them the right to the custody of his child; that this proposition was not accepted when made, but that during the next week Mrs. Hearn proposed to him that if he would have his "adoption papers" canceled, and forward them to a named bank, she would instruct the cashier thereof to pay him the fifty dollars. Manifestly this was not an unconditional acceptance of his offer, but merely a counter offer made by her, which, never having been accepted by him, so far as disclosed by the record, did not operate to bring about a contract between them. An answer to an offer will not amount to an acceptance thereof, so as to result in a binding contract, unless it be unconditional and identical with the terms of the offer. If there be a variance between the offer and the answer thereto, then there is no acceptance, but a counter offer, which, to result in a contract, must be accepted by the original proposer. Clark on Contracts, 37.

4. In view of the evidence submitted on the hearing, we do not think that the judge, in the exercise of the discretion vested in him in such cases, was authorized to award the custody of the child to the defendant, rather than to the plaintiffs, the adoptive parents. There was uncontradicted evidence to the effect that Mr. and Mrs. Monk were each thirty-two years of age; that they had been married several years and had no children of their own; that he owned realty of the value of twenty-five hundred or three thousand dollars and three or four hundred dollars worth of personalty; that he was a graduate of the Normal School of Alabama, had been teaching school seven or eight years, and at the time of the trial was superintendent of the schools of Phenix City in that State, at a salary of six hundred dollars per annum. There was absolutely no evidence tending to show that either he or his wife was an improper person to have the custody of the child they had regularly adopted, or that they had ever in any way mistreated her. It appeared that the defendant was a maiden lady, worth between four and five thousand dollars, and there was no question as to her ability and fitness to rear the child. Both plaintiffs and the defendant professed to love her, but the child expressed a decided prefer-

ence to remain with the defendant. Under these circumstances, we are constrained to hold that our learned brother of the trial bench erred in awarding the custody of the child to the defendant. If all else were equal, the adoptive parents, who had never relinquished their right, were certainly entitled to the custody of the child, in preference to the defendant, who had no legal claim to her. It was ruled in *Miller* v. *Wallace*, supra: " In all writs of habeas corpus sued out on account of the detention of a child, the court, on hearing all the facts, may exercise. its discretion in .awarding the custody of the child, and shall have authority to award such custody to a third person. Such discretion, however, is not arbitrary or unlimited, but is a discretion guided and governed by the rules of law. Under the discretion vested in him, no judge has authority to disregard or even to impair any acknowledged or established right of a party by its exercise, and if he does so, he abuses that discretion. The power ought to be exercised in favor of the party having the legal right, unless the circumstances of the case and the precedents established would justify the court, acting for the welfare of the child, in refusing it."

5. In view of the rulings we have made, which dispose of the case upon its substantial merits, we deem it unnecessary to pass upon other assignments of error presented in the bill of exceptions.

*Judgment reversed. All the Justices concurring, except Lewis, J., absent, and*

LITTLE, J., dissenting. It is my judgment that, under the evidence contained in the record, the question of awarding the custody of the child was a matter to be governed by the exercise of the sound discretion of the judge; and that it was not abused by the judgment he rendered.