## SLOAN v. JONES et al.

1. While the judge, upon a hearing of a writ of habeas corpus for the detention of a child, is vested with a discretion in determining to whom its custody shall be given, such discretion should be governed by the rules of law, and be exercised in favor of the party having the legal right, unless the evidence shows that the interest and welfare of the child justify the judge in awarding its custody to another.
2. Prima facie the right of custody of an infant is in the father. On the hearing of habeas-corpus proceedings against him, if it is claimed that the custody should be taken from him and awarded to the maternal grandmother, the power ought to be exercised in favor of the father, unless he has relinquished or forfeited his right, or the circumstances of the case would justify the court, acting for the welfare of the child, in refusing it.
3. The original application for the writ of habeas corpus in this case was made by the mother of the child against the father, but she relinquished her claim to have the custody awarded to her, in favor of her mother, to whom it was sought to have the custody of the child awarded instead of to the father.
4. The facts and circumstances, as disclosed by the evidence, did not authorize a judgment taking the custody of the child from the father and awarding it to the grandmother.

Argued February 14,—Decided July 15, 1908.

Habeas corpus. Before Judge Fite. Bartow superior court. January 18, 1908.

On January 2, 1908, Mrs. Laura J. Sloan made affidavit for the purpose of having a writ of habeas corpus issued, alleging that her child, a little boy twenty-four months of age, was illegally detained by his father in his exclusive possession; that he threatened to remove the child beyond the limits of the State, and she apprehended he would do so; that he had no home in the State where he could keep and comfort the child, and "said B. C. Sloan

has never supported said child or paid its expenses;" and that the petitioner had a home with her mother, who was able and capable in every way of rearing the child, and who was willing and anxious to do so. The writ of habeas corpus was issued, with an order to the sheriff to take possession of the child and bring him before the court. The writ having been executed, the child brought before the court, and due return made by the officer, and neither side being ready for trial, the hearing was continued until another day, and in the meantime the child was, by order of the court, placed in the custody of his maternal grandmother until the time set. After this the grandmother filed her petition to intervene in the case, alleging, among other things, that she was entitled to the custody of the child; that she was attached to him and was willing, ready, and able to take, rear, and care for him. She also alleged that she had sufficient means to insure his maintenance, comfort, and education, and that she had made a will including a provision for him. She prayed that the custody of the child be awarded to her, and that a rule nisi be issued, requiring both parties to show cause why this should not be done. This intervention was allowed by the presiding judge. On the hearing the respondent moved to quash the habeas-corpus proceedings and the writ, because the original petition did not set forth any sufficient allegations on which to base the issuance of the writ or to show that the detention was illegal. He moved that the petition or intervention of the grandmother, Mrs. Laura A. Jones, be quashed and stricken from the files, as showing no right on her part to intervene, or ground for the judgment prayed for by her. He also moved that the order allowing the intervention be vacated. Each of these motions was overruled. The original petition and the intervention were then answered by the respondent.

So far as necessary to be stated, the evidence on behalf of the applicant and the intervenor was as follows: Mrs. Jones testified, in brief: In June, 1906, the respondent, Sloan, was living in Nevada, and his wife was living with her parents in Cartersville. Mr. and Mrs. Jones were very anxious to effect a reconciliation between them. Sloan wrote to Mr. Jones that he would not return to Georgia unless his wife requested him to do so. Mr. Jones insisted that his daughter should write her husband to return, and she did so, though objecting to so doing. Sloan telegraphed for

$700.00 to arrange matters. Mr. and Mrs. Jones borrowed that amount from bank and sent it to him; and after receiving it, he returned to Georgia in the latter part of June, 1906. On his return Mrs. Jones fitted up a home for them from her own funds. They kept house about six weeks, when Mrs. Sloan was taken sick and her general health was impaired. Then Mr. and Mrs. Jones took the Sloans to their house, where they lived until the day before the present writ was sued out. While living there Mrs. Jones furnished all necessary food and clothes for the child and paid all household expenses. Mr. Sloan had no position, and the witness knew of his doing nothing to secure one. He never talked to her about his business plans, except as to some mineral interests; and she knew of no income that he had. He was out no necessary expenses except for his wearing apparel. He spent most of his time reading. He never offered to pay the witness or her husband any board for himself or for his child. Mrs. Jones never thought of his paying board for his child, for the reason that he did not return to Georgia until the child was six months old; and as she had supported, cared for, and become attached to the child, she never expected to have any one then or afterwards claim him and deprive her of him. She had never made any request of Mr. Sloan to pay board, because she did not think he was able to do so. The only reference ever made to paying board was one night, after he had been at her house for many months, when he and his wife had heated words in which she told him he had no right to give her directions, because he had not supported her or paid her board. He turned to Mrs. Jones and said: "Mother, I didn't know that I was expected to pay board," to which Mrs. Jones replied, "No, I didn't expect you to pay." Mrs. Jones said this because she had no grounds to anticipate that he was able to pay, and, as long as he remained in her home without income or position, she did not feel that she could reasonably expect board of him. She knew that her home was the only place where both he and her daughter could enjoy the companionship of their child. He had no home in this State or elsewhere, to her knowledge. She never believed that he would attempt to take the child away from her and Mrs. Sloan. He gave her his sacred word of honor that he would not. Mrs. Jones is worth $100,000, and has an income of $3,000 from insurance companies. All of her children are grown, married, and

self-supporting, except Mrs. Sloan, who is dependent on her. Out of her income she helps her children to some extent, but does not encroach on the corpus. If the custody of the child is awarded to her, she will give him the best education he will accept, and will endeavor to fit him for a useful life. Her husband was a Protestant minister, and loved his grandson very much. Sloan, the father of the child, is a Catholic; and if he be allowed to have the custody for the next few years, the child is almost certain to become a Catholic. Months before the commencement of the present litigation she made a will, by one item of which she bequeathed certain property to her daughter, Mrs. Sloan, for life, with remainder to any child or children who might survive Mrs. Sloan; and in case of no child or children surviving Mrs. Sloan, the property was to revert to the estate of the testatrix. She also provided in her will that Sam Jones Sloan, the child involved in this controversy, should receive from her estate, "a finished education and maintenance," if the income from the property thus devised was insufficient for that purpose.

Mrs. Sloan testified, in brief, as follows: She was married to Sloan on March 29, 1905, and went to Pennsylvania with him, and a little later to West Virginia. During the month of April of the same year she and her husband had several disagreements; and in the latter part of May they had a quarrel which caused her to realize that they could not be happy together. From that time she never lived with him as his wife, though they kept house a few weeks during a subsequent year. She made several visits after this quarrel, and then came to Cartersville to live with her sister, reaching there about July 18, 1905. Sloan went to Nevada in October, 1905. After he reached there he sent her $50, and at Christmas sent her $100. On January 1, 1906, she went to her mother's and father's home to live, her baby having been born in December, 1905. After this he sent her $50 a month until about June, 1906. Her father endeavored to get her and her husband reconciled. Sloan wrote that he would not come unless his wife wrote to him to do so. He afterwards telegraphed for $700. Mr. Jones requested her to write and ask Sloan to come, which she did "simply to fulfil the requirement" of her father and to gratify him. Sloan returned on June 29, 1906. Mrs. Jones fitted up a home for them, where they kept house about six weeks, when Mrs. Sloan became

sick, and they went to live with Mr. and Mrs. Jones, where they remained afterwards without paying board either for themselves or for their child. Since the death of Mr. Jones in October, 1906, the witness and her husband have occupied separate rooms. He has paid none of her expenses, and none for the child, except $5 for a cloak, $5 for toys at Christmas, and $3 for underwear. He paid the nurse a part of the time. His association with the child was unrestricted, and he was with the child a large part of the time. Finally he carried the child out one afternoon to see a football game, and, instead of coming back, drove twenty miles through the country with the intention of taking a train and carrying the child to Pennsylvania. Mrs. Sloan sued out a warrant for "abduction," and caused him and the child to be brought back. She then sued out a writ of habeas corpus, which she did to prevent her husband from taking the child out of the State and away from her. "He is my child, and I have a right to his custody, his company, and his love." She consented to the prayers of her mother's intervention, because the latter had the financial ability to rear and educate him, and was better able to do this than either she or her husband. Sloan is a Catholic, and has told her that it was his intention to place the child in a Catholic institution in Pennsylvania to be brought up. Her father was a Methodist evangelist. In the last conversation she had with him, he told her that it was his hope that she might raise her baby so that his mantle might fall on the infant's shoulders. She added: "I feel it my duty, my sacred duty, to do all in my power to obey my father's last injunction, and to prevent my boy from being made a Catholic."

There was other evidence tending to show, that, during his stay in Cartersville, Sloan did not have any position, or (so far as the witnesses knew) income; that he returned no property for taxes there; and that he had stated that he intended to carry the child to Pennsylvania. Several witnesses testified that Mrs. Jones was a good woman, possessed of considerable property, fond of the child, financially able to rear the child, and a fit person to do so. Some of the witnesses gave their opinion that those who cared for a child in its tender years formed a most lasting attachment for it. One stated (apparently without objection) that he thought she would do all in her power to make the child's life a happy and useful one, if it were awarded to her; and another (also seemingly

without objection) expressed the opinion, "I believe she should have the sole custody of the child."

B. C. Sloan testified, in brief, as follows: He was married to Laura Jones Flournoy, a daughter of Rev. Sam P. Jones, on March 29, 1905. He was then acting in the capacity of superintendent for a firm at a salary of $1,200 and expenses. Soon after his marriage this was increased $25 per month. Four months after his marriage the conduct of his wife became such that he could not properly attend to his duties, and, on account of the mental anguish caused by it, was forced to give up his position. She wanted to return to Georgia and spend a few weeks with her mother. He placed her on the train, giving her a through ticket to Chattanooga and sufficient money to pay all expenses incident to the trip, and enough to last for two weeks after her arrival. Four days later she called him by long-distance telephone from Louisville, Kentucky, and informed him that, instead of going to Georgia, she was in Louisville at the Confederate reunion, and requested to be allowed to draw a sight draft on him for $50, as she was out of money, to go to her destination. He consented on condition that she leave Louisville that night. She drew on him for $100, stayed in Louisville several days, and then went on to Catoosa Springs, in Georgia, where her mother was. After the first week he sent her $20 per week while she was there, and in addition she drew on him through bank for $40. After several weeks she went to the home of her sister near Cartersville, and there wrote to him requesting him to come to her. He did so, and while there decided to go west, his wife being willing and desirous of going, and thinking that she could do better away from her old associates both in Georgia and in Pennsylvania. He then returned to Pennsylvania, settled his affairs there, and came back to Georgia in September or early in October, 1905. He was informed by his wife's family that she was in no condition to travel; and they arranged for her to stay with her mother. He did not desire for her to be dependent upon her parents, but her mother would not accept money for her board. He went west, leaving with his wife $50, and telling her that he would supply her regularly with whatever amounts she needed. He obtained employment, filled several positions, and was earning a good salary by January, 1906. He sent his wife $25 in October, $25 on November 16, $50 on November 27, $25

on December 11, and $100 on December 18. In addition to this, he paid $25 on an order given by his wife to another person. After their baby was born, on December 11, 1905, he notified the attending physician and the druggist who furnished medicines at Cartersville to send him a statement of their accounts every thirty days, which he paid promptly, the drug bill amounting to $185.45, and the physician's bill to $61.50. Before and after the birth of the child Mrs. Sloan was living with her sister, and informed him that she was paying one half of the living expenses. Between October 15, 1905, and January 19, 1906, he sent his wife in the aggregate $405. During February he continued to send her money, and her father wrote to him not to send her so much, as she had no legitimate use for it. After that he made her an allowance of $50 per month until he returned to Georgia. Aside from his salary he had acquired certain mining stocks and had bought an interest in a mercantile enterprise. While in this situation, his wife's father urged him to return to Georgia, assuring him that his wife had seen the error of her way and would conduct herself differently thereafter. He informed Mr. Jones of his prospects and that he desired to remain two months longer, so as to dispose of his holdings and finish paying for an interest in a produce business which he had bought, but expressed a willingness to close up his business and return to Georgia, if his wife was sincere in her promises. Both his wife and her father urged him to come, and Mr. Jones sent him $700 with which to finish paying for his interest in the produce business. He did this, closed up his affairs, and returned to Georgia. After his return, he received some profit from the business, and was then notified that it had been wrecked by his partner. After his return to this State he began housekeeping, and paid all expenses. His wife became unwell, and her father carried her over to his house and prevailed upon him to close up the home where they were living and follow his wife. After the death of Mr. Jones, Mrs. Sloan threw aside all pretense to doing what was right. He pleaded with her to do better for the sake of the child and the memory of her father. But she informed him that she would teach her child to think that what she did was right. He made her certain propositions looking to an amicable separation, which she rejected. He then advised her to seek the advice of counsel as to her rights, as he would protect the child by

all means. Later she stated that she knew she had no right to the child, but had forfeited any such right, and asked him to leave the baby with them until it was past the teething age. He expressed an opinion that it would be best for him to go away, but Mrs. Jones urged him not to do so, and begged him not to take the child away until she (Mrs. Jones) became stronger, as she could not bear the separation from the child. He expressed an apprehension that he would lose his standing in the community if he remained, and that he might lose the legal right to the possession of his child, should it ever become necessary to go to court to settle the matter. Mrs. Jones assured him that he need not worry on that ground, that she would protect him, that she would never raise her voice against his taking his boy, and that she would not allow any one else to do so. She made this promise several times. After the death of Mr. Jones, Mrs. Jones urged him to remain with her, and he did so, assisting her in the preparation of a book on the life and sayings of her husband. On two occasions he offered to pay Mrs. Jones board for himself, wife, and baby, but she declined to accept it, saying that the services rendered her by him were such as money could not pay for, and that she did not wish him to mention it again. If he had kept an account of moneys paid out by him, contributions to household expenses paid to Mrs. Jones, Mrs. Sloan, her sister, the servants, for groceries, for express parcels, and for fire insurance, as he would have done at his own home, he is sure it would in the aggregate have amounted to more than any board charged in Cartersville. In August, 1907, he agreed for his wife and baby to go to Ohio and Kentucky on a visit, and let her have the money for that purpose. She was to remain two weeks. She remained a month, and then made a sight draft on him for $150, and another on her mother for $200, and took the baby and nurse and went to California. He went to Kentucky, and learned that she had gone to San Francisco. He then returned to Cartersville, and in company with her sister went after Mrs. Sloan and the child. Mrs. Jones requested that he do nothing to give publicity to the affair, nor do any one bodily harm, promising at the time that, when they returned, she would place his wife in a sanatorium where she could be treated. After his return Mrs. Jones stated that she could do nothing with Mrs. Sloan. He requested her to keep his wife off of the streets, which Mrs. Jones promised,

but failed to do. Finally, believing that the associations with which the boy was surrounded were detrimental to his proper rearing, respondent decided to take the child to his mother in Pennsylvania, until such time as he could establish a home of his own, with his sister to keep house for him and assist in caring for the child, she having agreed to do this. In November, 1907, he told Mrs. Jones that he could not see any hope of getting his wife to do what was right, and that he was going to take his boy home to his mother. Mrs. Jones informed him that she knew that Mrs. Sloan had forfeited all rights, both legal and moral, to the boy, but that it would break her (Mrs. Jones') heart to have him take the child away, but she would stand aside and not interfere. A church conference was then going on or about to commence, the town was filled with strangers, and there were guests at the home of Mrs. Jones. She asked him to leave the boy until after the conference was over. On account of cares and responsibilities placed upon Mrs. Jones by the loss of her husband, and her anxiety touching the condition of her own children, she is not in a condition to properly care for the child. To award the custody of the boy to Mrs. Jones would, in effect, be to deliver it to the exclusive control of Mrs. Sloan, who is wholly unfit for the responsibility.

The respondent introduced a number of cancelled checks, some of them payable to nurses for services in caring for his child, some of them payable to Mrs. Sloan, some of them to the druggist, one to the physician who attended her, and one to another physician for attendance on the child, all tending to support many of his statements in regard to money furnished by him. He also introduced a letter sent to him in Pennsylvania by his wife in August, 1905. Among other things it contained the following: "You've been the most generous man on earth in your treatment to me, and. I am so grateful to you. There is no way for me to show you until this time of probation is over, but then I *will* prove to you that my gratitude is sincere, and my promise will remain unbroken. I read Mama the parts of your letter that you said you would tell her about your change of plans, and she said she would not hear of me going to stay with Marm, which of course you can't blame her for. I will never be able to tell you how I appreciate your goodness to me. If by dying I could have saved Mama and Marm what you have saved them, I would have gladly have done so, would now,

but I had to live on, and I will live to show you my appreciation. . . You know I'd much prefer going with you, no matter how uncertain your position. I'm not afraid of your not being able to make a living for me *ever,* and I almost go crazy when I think of your leaving me so far, but it's all right, and I know you have done what you think is best, and your judgment is much better than mine, hard as it is to accept. . . I don't want you to do anything to get a position that you wouldn't do were I not living. . . You know that all my gratitude is yours, and your wishes are my first consideration, through all the years to be." She also .suggested her making a visit to Pennsylvania and returning with him on his way to the west; and made certain suggestions as to taking a house if she remained in Cartersville during the winter.

A letter to Sloan from Rev. Sam P. Jones, the father of Mrs. Sloan, was introduced, dated May 27, 1906. In it he enclosed a letter from his daughter, Mrs. Sloan, to her husband, and urged Sloan to return to Cartersville immediately, stating that he hoped he would see Sloan in Georgia by the first of June, and that the latter would be the happiest man in America. Enclosed in this letter was one from Mrs. Sloan to her husband, which contained the following, among other things: "You will love him [the child] to death when you feel his little arms around your neck, and now is the time for you to come home, and get something to do, so you can be near here, so you can have Sam and me with you. I want you to come, and I do want the past to bury its dead and let's begin anew with our lives centered in the precious little boy God has given us. I want to do what is right, and I am so sorry for all the past. Come back and·I'll atone as far as in my power lies, and my efforts will all be to make your future lives just what they ought to be—what they should have been in the past. Don't wait any longer to come to Sam and me here in the country." It was signed "Lovingly, Laura."

The respondent introduced a number of witnesses showing his upright character, deportment, and standing in various places where he had lived; that he was a suitable person to have the rearing of the child; that he was moral, sober, industrious, a competent mining and engineering superintendent, and able to earn and command a good salary. His mother and brothers and sisters, who had homes, expressed a willingness to have the child brought to them, and to

aid Sloan in caring for and rearing it.  One sister stated that she was willing to live with him and assist in making a home for him either in Pennsylvania or Georgia, and stated that her brother was capable of earning sufficient money to provide the necessaries of life.  Witnesses also testified to the good character of Sloan's mother, and that she was a suitable person to aid in the rearing of the child.

In rebuttal one witness testified that Sloan had said that he intended to take the boy, if the custody should be awarded to him, and that none of the Jones family would ever see him again, and that they would have a time getting him back.  Mrs. Jones did not deny specifically many of the statements made by Sloan.  She testified, that "In the summer of 1907, when her daughter Laura, the plaintiff, left home and was living in San Francisco, she paid all the money that was necessary to search for and find her, and to send my other daughter and Mr. Sloan out there after her to bring them back; that if Mr. Sloan paid any item of this expense, it was not with her knowledge; that she furnished ample means to prevent his doing so on account of her daughter's trip, or her return, or any expenses incident thereto; that Sloan did not render her any services worth $150 per month, or any other considerable sum.  She denies that she ever waived her claim to the child or recognized the rights of the father; she denies that Sloan offered to pay his board repeatedly.  She expressly said that, if said child should be awarded to her, she pledged her honor to take full and exclusive control of said child, and that said Laura Sloan shall not be allowed to exert any evil influence over said child."

The presiding judge entered a judgment that the exclusive custody and control of the child, Sam Jones Sloan, be awarded to Mrs. Laura A. Jones until December 11, 1912, and until the further order of the court, with the right to either of the other parties to hereafter move to award such custody and control to them, "when said motion is predicated on a change of conditions."  It was further directed that the child should be kept in the State of Georgia, unless an order of the court should be granted Mrs. Jones to take him beyond the limits thereof.  It was further ordered that Mrs. Jones should allow each of the parents of the child to be with him as often as they should desire, provided she could conveniently be present during such visits, and that either parent should be al-

lowed to contribute at any time anything for the comfort or luxury of the child. Sloan excepted.

*Thomas W. & Watt H. Milner,* for plaintiff in error.

*John T. Norris, John H. Wikle,* and *Thomas E. Watson,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

The rulings of the trial court in regard to the pleadings and the intervention of the maternal grandmother were of doubtful propriety; but as the child was produced in response to the writ, the court practically took him into custody by temporarily awarding him to a third person until the hearing could be had, and the application of the mother set out the ability and willingness of the grandmother to furnish a home for the child and rear him; and as the presiding judge preferred to hear the case on its merits, and did so, we will pass, without further discussion, from the technical questions of pleading, and deal with the substance of the case.

The right of a father to the custody of his minor child, and the discretionary power of a judge, upon the hearing under a writ of habeas corpus issued at the instance of the wife, to award the custody to a third person, if the welfare of the child so requires, have frequently been the subject of consideration. As early as 1836, in the matter of *Mitchell,* Judge R. M. Charlton, of the superior court, filed an able and elaborate opinion on the subject. In the course of it he made use of the following language: "The power ought to be exercised in favor of the party having the legal right, unless the circumstances of the case and the precedents established would justify it [the court], acting for the welfare of the child, in refusing its aid. It becomes important, then, to inquire who has the legal right to the custody of this infant; and it seems to me that the answer that would rise to the lips of any one, however unskilled he might be in the science of the law, would be that such right resides in the father. The law of nature, the feelings which God has implanted both in the man and the brute, alike demand that he who is nearest to it, who is the author of its being— who is bound to its maintenance and protection, and answerable to God for the manner in which it is reared, should have its custody, and the law of man, which is founded upon reason, is not hostile to the assertion of this claim. Lord Ellenborough, in the case of the King *v.* DeManneville (5 East, 223), speaking of the father, says, 'He is the person entitled by law to the custody of his child.

If he abuse that right, the court will protect the child.' . . But notwithstanding this legal right of the father, circumstances may exist which would justify a court, in this proceeding, in refusing to lend its aid to him in procuring the custody of his child, or even withdrawing the infant from his custody, when its morals, its safety, or its interests seem to require it. All legal rights, even those of personal security and liberty, may be forfeited by improper conduct; and so this legal right of the father to the possession of his child must be made subservient to the true interests or safety of the child, and to the duty of the State to protect its citizens of whatever age." Numerous authorities, both English and American, were cited to sustain the positions announced. *R. M. Charlton,* 493 et seq. That decision was rendered before the organization of the Supreme Court, but it has been cited several times by this court. It arose on a writ of habeas corpus issued at the instance of Mitchell, the father of the boy whose custody was in controversy, against the child's maternal grandfather, in whose house it was born and had remained, with the father's consent, for some three months, up to the time of the issuance of the writ, the mother having died in childbed. It was contended that the father had promised his wife on her deathbed that the child should remain with her parents during its infancy, though this was denied by him.

In *Miller* v. *Wallace,* 76 *Ga.* 479, Mr. Justice Hall, as the organ of the court, delivered a full and carefully prepared opinion touching the subject now before us, in which he reviewed and discussed various earlier decisions, including those of *Mitchell,* R. M. C. 493; *Boyd* v. *Glass,* 34 *Ga.* 258 (89 Am. D. 252); *Taylor* v. *Jeter,* 33 *Ga.* 195 (81 Am. D. 202); *Bently* v. *Terry,* 59 *Ga.* 555 (27 Am. R. 399); *Janes* v. *Cleghorn,* 54 *Ga.* 9, s. c. 68 *Ga.* 87; *Smith* v. *Bragg,* 68 *Ga.* 650; *Lindsey* v. *Lindsey,* 14 *Ga.* 657. After stating that it is indisputable that the father, under the law, has the control of his minor child, and that this can be relinquished or forfeited only in one of the modes recognized by the law, and that it is equally clear that in writs of habeas corpus, sued out on account of the detention of a child, the court, on hearing all the facts, may exercise its discretion, as to the person to whom the custody of the child shall be given, and shall have power to give such custody to a third person (Civil Code, §2453), he declared

that "The discretion to be exercised in such case is not an arbitrary and unlimited discretion like that confided to the Roman prætors, but, as remarked by Lord Mansfield in R. v. Wilkes, 4 Burr. 2527, is such a 'discretion as, when applied to a court of justice, means sound discretion guided by law.'" Again, he said: "The rule of discretion, as applicable to habeas corpus cases, did not originate with the compilers of our code; they took it from the common law, and in adopting it they adopted also the meaning and limitations placed upon it by the venerable sages and authorized expounders of that noble system. Under the 'discretion' vested in him, no judge has authority to disregard or even to impair any acknowledged or established right of a party by its exercise; and if he does so, it would seem to follow, as a necessary consequence, that he abuses that discretion. . . Prima facie, the right of custody of an infant is in the father, and when this right is resisted, upon the ground of his unfitness for the trust or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. . . The discretion to be exercised by the courts in such contests is not arbitrary. The rights of the father, on the one hand, and the permanent interest and welfare of the infant, on the other, are both to be regarded, but the right of the father is paramount, and should not be disregarded, except for grave cause. The breaking of the tie that binds them to each other can never be justified without the most solid and substantial reasons, established by plain proof. In any form of proceeding, the sundering of such ties should always be approached by courts 'with great caution and with a deep sense of responsibility.'" That case was a controversy between the father of a female child four years old and the maternal grandparents. It appeared that the child's mother, shortly before her death, stated that she wished her mother to take, care for, and raise the child, and for a time the father allowed the child to remain with her grandparents.

In *Taylor* v. *Jeter*, supra, Jenkins, Judge, said (p. 203) : "Had the respondent to the habeas corpus intended to rely upon the ground of unfitness for the office in the applicant, the latter should have been notified of it by a distinct allegation in the answer, and there should have been direct, satisfactory proof adduced to sustain it."

In *Monk* v. *McDaniel,* 116 *Ga.* 108 (42 S. E. 360), it was held, that "While the judge upon the hearing of a writ of habeas corpus for the detention of a child is vested with a discretion in determining to whom its custody shall be given, such discretion should be governed by the rules of law and be exercised in favor of the party having the legal right, unless the evidence shows that the interest and welfare of the child justify the judge in awarding its custody to another." The decision in *Miller* v. *Wallace,* supra, was cited and approved. In *Lamar* v. *Harris,* 117 *Ga.* 993 (44 S. E. 866), Mr. Justice Candler said (p. 997) : "The law does not fly in the face of nature, but rather seeks to act in harmony with it, and to that end encourages the formation and continuance of those ties which, by the inscrutable providence of God, bind man to his own flesh." In *Looney* v. *Martin,* 123 *Ga.* 209 (51 S. E. 304), the same Justice, in delivering the opinion, again approved this statement. These two cases turned on a contention that the father had relinquished his parental control; and it was held that there must be clear proof to authorize the disregarding of the father's right. See also *Carter* v. *Brett,* 116 *Ga.* 114 (42 S. E. 348) ; *Richards* v. *McHan,* 129 *Ga.* 275 (58 S. E. 839).

In *Williams* v. *Crosby,* 118 *Ga.* 296 (45 S. E. 282), Mr. Justice Lamar said : "In a contest between two parties, both of whom are fit and proper persons, the one having the legal right should prevail. If both are proper parties, but neither has a legal right, the one having the strongest moral claim should prevail. But in every case, regardless of the parties, the welfare of the child is the controlling and important fact. This is not intended to nullify the laws of nature; for in most instances it will be found that the legal right of the parent and the interest of the child are the same. But if through misconduct or other circumstances it appears that the case is exceptional, and that the welfare of the child requires that it should be separated even from its parent, the parens patriæ must protect the helpless and the innocent. They are the wards of the court, the hope of the State, and the seed-corn of the future." This was said in a case involving a controversy over the custody of a child between its parents, who had been divorced. The judgment in the divorce suit awarded the child to the mother. The court, on the hearing of the habeas corpus proceeding, apparently thought that the judgment in the divorce case prevented him from entering

into the question as to the fitness of the parent or the interest of the child, even on evidence as to these matters since the decree, and the language quoted was used in discussing this ruling.

It will thus be seen that prima facie the right to the custody of an infant is generally in the father, if living; but that this may be resisted on the ground of unfitness for the trust, or other good cause; and that, in reaching his judgment on a habeas-corpus proceeding involving the custody of the minor child, the presiding judge should award the custody to the person legally entitled thereto, unless it is made to appear that he has lost this right, or that the security, morals, or welfare and interest of the child require another disposition; and that the right of the father should not be disregarded and his child awarded to the custody of one neither the father nor mother (even though a grandparent) save for grave and substantial cause. The rights of nature are not to be lightly overridden on the one hand, nor is the welfare of the child to be disregarded on the other.

The case most cited as authority for the discretionary power of the court, and which some of the decisions seem to treat as declaring in favor of an almost arbitrary discretion, is that of Rex v. Delaval, 3 Burr. 1434, in which Lord Mansfield said that "The court is bound, ex debito justitiæ, to set the infant free from an improper restraint; but they are not bound to deliver them over to any body, nor to give them any privilege. This must be left to their discretion, according to the circumstances that shall appear before them. . . The true rule is, 'That the court are to judge upon the circumstances of the particular case; and to give their directions accordingly.'" In that case a girl of eighteen years of age had been debauched by Sir Francis Delaval, and was notoriously his mistress. A writ of habeas corpus was taken for her custody by her father. On the hearing, she did not wish to go home with her father, but declared her attachment for Sir Francis. The learned judge thus decided: "Let the girl therefore be discharged from all restraint, and be at liberty to go where she will. And whoever shall offer to meddle with her, redeundo, let them take notice 'That they do it at their peril.'" The report does not show what followed, but presumably she returned to Sir Francis, and her father did not "meddle with her." One or two observations may be made in regard to that case. While it is unquestionably an au-

thority for the use of discretion by the court, the remarks of the same learned judge in Rex *v.* Wilkes, 4 Burr. 2527, supra, on the subject of the meaning of discretion and its proper use, show clearly that he did not intend by the employment of that term that courts could disregard entirely legal rights, powers, and duties in its exercise. Again, whatever may be the case with persons of full age or who have sufficient discretion to determine their own actions, it could not be held that a court, on the hearing of a habeas-corpus proceeding for the custody of a child two years of age, could pursue the plan adopted in the Delaval case and set it free to go where it pleased. Wrongful custody of children may not be in fact against their consent, but sometimes as they desire. But the writ of habeas corpus has come to be treated as a method of determining their proper custody. The wrongful custody of a child, especially one of tender years, who can not in law choose for itself, is considered a sufficient illegal restraint of liberty to authorize the issuance of the writ; and while the wishes of the child may be heard and considered, its immature will is not controlling on the court. When a child of tender years is brought before the court on such a writ, its custody must be determined and awarded to some person. It is different from a grown person who is entitled to his own custody, and who can not lawfully be kept in custody or restraint against his will by another, save in certain exceptional cases, such as that of one arrested for a crime, or confined as a lunatic, or the like. A child is not entitled to its freedom like a grown person. A parent or guardian is entitled to the custody of the child. Our own statutes recognize this distinction, as do also adjudicated cases. See Civil Code, §2502. In such cases, the trial court has a discretion, but in its exercise he must consider the natural rights of the parent, as well as the dictates of humanity and the welfare of the child. In this connection the remarks of Chief Justice Sharkey in his dissenting opinion in Foster *v.* Alston, 6 How. (Miss.) 472, are worthy of consideration. See also Civil Code, §2453 (which was codified in part from the act of 1845 (Cobb's Digest, 335) on the subject of awarding a child to its father or mother), §§2461, 2503; Penal Code, §1226; Shaw *v.* Natchwey, 43 Iowa, 653; Brinster *v.* Compton, 68 Ala. 300; State *v.* Smith, 6 Greenleaf, 462 (20 Am. Dec. 324). Those who may be interested in pursuing the subject further will find discus-

sions of it in Hurd on Habeas Corpus, 462-521; Church on Habeas Corpus (2d ed.), §§ 423-454; in the opinion, dissenting opinion, and elaborate briefs in Foster v. Alston, 6 How. (Miss.) 406; in monographic note to Smith v. State, 20 Am. Dec. 330; and in 15 Am. & Eng. Enc. Law (2d ed.), 187, and notes.

There are many cases where infants of tender years have been awarded to the custody of their mothers rather than to that of their fathers. There are also cases where the court has refused to disturb the custody of grandparents under habeas-corpus proceedings by a parent. It would be useless to cite numerous cases of the one character or the other, and show on what special facts each rested. It may be said that where the mother and the father are both fit and proper persons to have the custody of the child, in a controversy between them (where discretion is somewhat more freely used), the necessity for maternal care or nurture in infancy or early childhood, or the sex of the child, has sometimes been a potent circumstance. In some of the cases the father abandoned his child or relinquished his paternal right to its grandparents or others; in some of them he let the child remain in their entire custody and charge for a long period of time, and either he appeared not to be a fit person to rear it, or the facts were such as to show that the welfare of the child required its custody to be left undisturbed. Here the father had the child. The mother instituted proceedings to have it taken from him and delivered to her, under a writ of habeas corpus. The maternal grandmother intervened or appeared and asked that the custody be given to her. When he started to leave with the child, he was arrested and brought back under a criminal warrant, which is spoken of as being for "abduction," a somewhat singular proceeding, unless a father has parted with his parental right to the custody of his child. See Hunt v. Hunt, 94 Ga. 257 (21 S. E. 515).

In the light of the foregoing discussion of the principles involved in such cases, let us briefly consider some of the salient facts in the present case bearing on the question between the husband and wife and between the father and the grandmother. It seems to be beyond question that the mother, who was the original applicant for the writ of habeas corpus, is not entitled to the custody of the child, and is not a properly qualified person to have him. When her mother filed her intervention, she alleged that "Your intervenor's

daughter, the above plaintiff, is physically weak and of a nervous temperament, which prevents her administering to her child at all times with the gentleness and tenderness and discretion of which your intervenor feels and believes she herself is capable." On this intervention the mother of the child signed an acknowledgment of service and added, "Without waiving any of my rights to hereafter be heard for the custody and control of my child, Sam Jones Sloan, as against any right which may be asserted or claimed by my husband, B. C. Sloan, in this proceeding, or any other proceeding, I hereby consent for the prayers of my mother's intervention to be granted." Thus, while seeking to reserve the privilege of resisting the claims of the father, she practically abandoned any claim to the custody of the child in favor of her mother. In an affidavit filed by Mrs. Jones, the grandmother, as it is set out in the bill of exceptions, she expressly said, that, "if said child should be awarded to her, she pledged her honor to take full and exclusive control of said child, and that said Laura Sloan shall not be allowed to exert any evil influence over said child." Doubtless this fond grandmother was sincere in making this statement. But the testimony discloses that her daughter was living with her, and evidently intended to continue to do so. If there was any evil influence to be apprehended from the mother, it is difficult to see how the grandmother intended to prevent it in the daily contact of mother and child living together. Clearly, under the pleadings and evidence, the original applicant for the writ was not entitled to the custody of the child.

Next let us consider whether the evidence authorized the taking of the child from the father and delivering him to the grandmother. There is no pretence that he had relinquished his parental right by contract; nor is there the slightest intimation that he is a man of vicious, immoral, or dissipated habits. Indeed no attack is made on his character, while the evidence of numerous witnesses who knew him in the places where he had resided shows him to be upright, industrious, a suitable person to have the rearing of his child, and capable of earning enough at his vocation to amply supply necessaries. His mother and sisters, who appear to be good people, offer their homes and services in assisting him. The evidence indicates that he was twice broken up in business by the conduct of his wife; that he sent her money in considerable sums dur-

ing his absence; that he gave up his business, salary, and prospects in the west, where he had established himself, and returned to Georgia at the urgent request of his father-in-law and his wife, in the hope that all differences between them might be reconciled, and he might be with her and his child.  His wife's letters to him, which are partly copied in the statement of facts, are couched in terms which utterly repudiate any idea of fault on his part, and show that she admitted that whatever fault there had been, it was hers.  If he did not obtain a position in Cartersville or its vicinity, there is nothing to show that he could have done so in the vocation for which he was fitted.  He did not pay board at the house of his wife's parents, where she was taken at their instance, and where he also resided at their request.  But it is clear that no board was demanded of him; and, whatever may have been the unexpressed thoughts or reasons of Mrs. Jones, he was informed at least once that he was not expected to pay, according to her own testimony.

We appreciate the inalienable love of Mrs. Jones for her daughter, and her affection for her grandchild.  We respect her solicitude for her child and her child's child.  It is sad that the evening of her life should be disturbed by the sorrow arising from the discord between her daughter and her son-in-law, and the consequent necessity for determining the custody of their child.  But, so far as the evidence discloses, the disaster was not the fault of Sloan. As fond grandmothers sometimes do, she even feels that she has legal rights to the child superior to those of his father.  But however tender may be her love for her grandchild, God gave the child to his parents, not to his grandparents.  In law the father is entitled to the custody, unless he has forfeited or lost that right, or unless the evidence shows that the interest and welfare of the child require that the custody shall be given to another.  He is legally bound for the child's maintenance.  The grandmother is not so.  What she does is voluntary.  Even a will drawn is revocable, and does not bind the testatrix while in life; though no present intention to revoke it is shown, but rather the contrary.

In addition to what has been said, and aside from the pathos which is inherent in all such cases, three reasons which may possibly have been considered in taking the child from his father and awarding the custody to the grandmother require notice:  First,

because she loves the grandchild and desires his custody. But surely so likewise does the father. In fact it appears that he was constantly with the child. Second, that she is a woman of considerable means, while he is dependent upon his industry to make a living. But the evidence indicates that he is capable of earning enough to support and care for the child, and he will have the aid of his sister and mother in rearing it. Nor is a difference in worldly circumstances in itself a sufficient ground for depriving a father, the natural guardian of his child, of its custody, and awarding it to a third party, where he is a fit person to rear it, and able to do so properly. Poverty alone, save perhaps in extreme cases, furnishes no reason to· deprive a parent of his offspring. *Moore* v. *Dozier,* 128 *Ga.* 92 (57 S. E. 110). In Verser *v.* Ford, 37 Ark. 27, it was said,· that, "As against strangers, the father, however poor and humble, if of good moral character and able to support the child in his own style of life, can not be deprived of the privilege by any one whatever, however brilliant the advantage he may offer." Under the facts of that case, the trial court declined temporarily to take a female child, nearly three years of age, delicate in health, and whose mother was dead, from the custody of the child's maternal grandparents,· on application by the father. The ruling was affirmed, but it was said: "Certainly, under the circumstances, if he had been in possession of the child, no chancellor could have found warrant in equity for taking her away to be placed under the grandmother's care." The third reason to be noticed is because the father is a Catholic, while the grandmother is a Protestant. It does not appear whether the child's mother is a member of any church. Surely, in a country where the fundamental law of the constitution (Civil Code, §§5709, 5710, 6014) guarantees the right of religious freedom and to worship God according to one's own conscience, it needs no argument to show that this does not furnish a ground for taking a child from the father's custody and awarding it to another. If it were deemed unfortunate for the daughter of a Protestant evangelist (which Mr. Jones was) to marry a Roman Catholic, and perhaps become the mother of children by him, there is nothing to show that the religious belief and church connection of the prospective husband were not well known before she became his wife. If the intended wife or her parents objected to his faith, it would have been better to raise the objection before

her marriage rather than when the father desired the custody of his child. Indeed it does not seem that this played any part in his matrimonial misfortunes, or was ever mentioned to him as an objection until the custody of his child was involved. Mrs. Jones testified that her grandson (two years old) "had been taught the Protestant faith from the day he was able to understand anything; that it is not her purpose to criticise Mr. Sloan for his faith, but that, on account of the above facts, and on account of the child's first impressions being of the Protestant faith, she feels that he should be allowed to be reared in a Protestant home; that Mr. Sloan, as a Catholic, would feel it his duty, enjoined upon him by his religion, to bring the boy up in his faith, and that if he be allowed to have the custody of the child for the first five years of its life, that it will be influenced by the Catholic teaching, and would almost surely become a Catholic." Mrs. Sloan more tersely stated that she felt it to be her duty to do all in her power to prevent the boy from being made a Catholic. But a court can not lawfully take a child away from his father for such a reason.

It is urged that the courts will not allow the child to be taken out of the jurisdiction. This may sometimes be true, as in cases where the court changes the custody, or perhaps in some other cases. But there is no arbitrary rule of law that a father who has and is entitled to the custody of his child can not be allowed to take him out of the State. Even yet, in his pleadings, he holds out to his wife the opportunity for reconciliation, saying that he desires to rear and educate his own child in his own home, where he may have the privilege of enjoying association with him and of educating and rearing him, "and there also have the association of his wife, Laura Jones Sloan, should she choose to occupy said home with him, and do her part toward making it a happy home."

We have given this case careful and painstaking consideration. We appreciate the importance of the issue involved. Cases concerning the custody of children of tender years always demand the utmost care and the most thoughtful consideration on the part of courts. They involve the welfare and best interest of the child. They touch upon the tenderest sentiments of human nature. But under the evidence in this case, we have been able to come to but one conclusion, which is that the father was entitled to the custody

of his child, and that our brother of the superior court erred in the judgment which he rendered.

*Judgment reversed. All the Justices concur.*