Johnson *vs.* Kelly.

E. AND J. W. JOHNSON, plaintiffs in error, *vs.* JOHN R. KELLY, defendant in error.

1. One's habits, temper, morality, sobriety, sense, or the contrary, should be ascertained when he applies for the guardianship of an idiot. (R.)
2. In a contest for guardianship of the person of an idiot, a colored man, one applicant being a white person, and the other an only sister and nearest of kin to the ward, the proof showed that both were unobjectionable, and the Court charged the jury "that other things being equal, relations were to be preferred:"

*Held,* That under the Code, section 1799, this charge did not, in its full meaning, present the provisions of law for the consideration of the jury. The language of the law is " the nearest of kin by blood if otherwise un-objectionable shall be preferred." The philosophy of the law is wise, and its administration ought to be enforced ; for superior advantages of wealth or intelligence in a stranger cannot justly invoke the exercise of a discretion vested by law in the Ordinary, when the nearest of kin is unobjectionable, and override the declaration of the law in favor of such nearest of kin by blood.

Evidence. Guardianship. Before Judge ROBINSON. Jasper Superior Court. April Term, 1871.

The opinion contains the necessary facts.

GEORGE T. BARTLETT, for plaintiffs in error.

KEY & PRESTON, for defendant.

LOCHRANE, Chief Justice.

This case presents a contest for the guardianship of a colored man, who is unfortunately an idiot. John R. Kelly, his former owner, when a slave, petitioned the Court of Ordinary to have him declared an idiot, and desired to be appointed his guardian. His sister and brother-in-law appeared and claimed the right of guardianship under the Code, and, by consent, both applications were heard together, and upon the hearing the Ordinary appointed Mr. Kelly, the defendant in error, the guardian. The sister, Emeline Johnson, appealed, and the case was tried in the Superior Court. The evidence showed upon the part of both applicants nothing objectionable in character, temper or condition, and disclosed a very strong attestation of the humanity and kindness of Mr. Kelly to his former servants. Several grounds of error are assigned upon matters transpiring upon the trial, which we do not deem it necessary to discuss in detail.

1. We remark, generally, that when the question before the Court and jury is the fitness of a person for guardian, the limitation upon the inquiries within the scope of his capacity and ability is not laid down, so that the questions are pertinent. It is proper to ascertain his habits, temper, morality, sobriety, sense, and responsibility, or the contrary. And the evidence in this case was within the general scope, and we think properly admitted.

2. The jury were charged by the Judge, as the law of the case, substantially, that the appointment of a guardian ought to be made with a view to the interest of the ward, etc., and that "other things being equal, relations were to be preferred."

Johnson *vs.* Kelly.

Upon examination of this evidence, we are satisfied that the charge of the Court misled the jury.   The Code, section 1799, declares: "Among collaterals applying for the guardianship, the nearest of kin by blood, if otherwise unobjectionable, *shall* be preferred."   In this case we have a poor, unfortunate, colored idiot, with the mere muscular or physical strength of a machine, when directed, capable of doing full work, and this contest comes up over the rights of the claimants to his guardianship.   Is is a fair submission of the law upon the facts in such a case, to say, other things being equal, relations have the preference, as a general proposition not controlled by our Code.   The principle that should govern, is not the mere pecuniary advantage of one applicant over another; this rule would give to the rich always a preference, when every day experience not only demonstrates the uncertainty of worldly treasures, but that while possessed they not unfrequently narrow the whole moral and natural manhood of our nature, trampling on its sympathies and hardening its emotions, until the transformation makes the object often capricious, suspicious and cruel.   The best man is not measured in his fitness for guardianship by his acres.   His humanity of heart, his deportment of justice in all his social relations, his consistency of truth, his integrity of sentiment, his sense, his unselfishness, enter into the material elements that constitute the whole character of capacity.   Even as between white men and white children, the idea of adoption must not blend with guardianship; for love, the ties of blood, the affinities of relationship, the similarities of habit, taste and association ought to be weighed and considered.   Is it not patent to any observer of the happiness of mankind, that it does not consist in gilded saloons, on crimson-cushioned chariots, or in the revelry of profligate dissipation, or the velvet of carpets, or softness of beds.   This negro would be happier in the cabin of his sister, upon straw, and happier with the association of her uneducated and unsophisticated ideas and habits, than among white people, where his life

would drag slowly over days of toil without the association or sympathy which a sister could give him.

The Code is emphatic. Its language is plain, and not modified by doubt: "Among collaterals applying for the guardianship the nearest of kin by blood, if otherwise unobjectionable, shall be preferred." Now the evidence shows the sister unobjectionable, and she was entitled, under the facts, to the guardianship, and it was the duty of the Court to have charged the law as to her right if unobjectionable, particularly in a case where a negro was the applicant against the white man. For, in such case, the doctrine of other things being equal could not be said to apply; for the advantages were apparent, and the dissimilarity, in many respects, unfavorable to the sister. But she was entitled to the guardianship if she was unobjectionable. Such is the Code, and the sentiment it enunciates meets with a prompt response in every breast. Judges have had great embarrassment in the decision of questions involving the rights to custody of children, and the rule of looking to the best interest of the child in the selection of guardians, even with the wisest jurists has turned out unfortunately. It is hard to set up a discretion which will stand the test. But the law wisely makes *blood* relationship or kin the test, and those who stand closest to the ward are to have the preference, not that one not so near who may be wealthier, more intelligent or educated, shall have it from these advantages. The law, in the long run, trusts to blood, if those nearest are unobjectionable. And the law trusts wisely. Argyle's love of the Tartan was cherished far from the Scottish coast; how much stronger the love of *blood* relationship? When, in the sunshine of life, all may run smooth, but while troubles gather they bring selfish aims to life. Against changes and vicissitudes of either fortune or time the truest anchor of reliance is *blood;* for the ties of affection, cemented by a common ancestry, scarcely ever snap or fly asunder when sickness invokes sympathy or poverty pleads for aid. Therefore the principle

is a wise one, and ought to be enforced in its terms without bringing *discretion* to operate in setting aside the law upon the part of the "Ordinary." The cases in which, if necessary, he may grant letters to a stranger in blood, are cases that do not fall within the principle of collaterals applying who are unobjectionable. For this section, if the whole subject is discretionary with the Ordinary, would be meaningless and absurd. If the Ordinary may in every case (meaning every case of collaterals applying who are objectionable) give the guardianship to a stranger in blood it would violate the intention and clear meaning of the law, which declares the nearest *shall* be appointed. For if over collaterals the rule applies, it must apply over strangers. We therefore think the Court, in this case, left too much to the discretion of the jury, and, upon the facts, grant a new trial.

Judgment reversed.