## CHAPIN *v.* CUMMINGS.

No. 13366. DECEMBER 4, 1940. REHEARING DENIED DECEMBER 13, 1940.

*Lindley W. Camp,* for plaintiff.
*Edgar & Allan Watkins,* for defendant.

REID, Chief Justice. We have here a voluminous record, but in so far as it relates to the essentials of the case to be passed on it tells first the story of Mr. and Mrs. Huntley Chapin, who were married and had a son named Huntley Chapin Jr. When the child was about a year and half old, in February, 1931, they were separated and divorced under a decree of a superior court in Illinois. Under the terms of the decree Mr. Chapin paid a substantial sum in settlement of alimony to the wife. The custody of Huntley Chapin Jr., was awarded to Mrs. Chapin, who, as the decree found, was a fit person to rear him. The decree provided that Mr. Chapin should pay thereafter $200 per month for the support of Huntley Chapin Jr., and made provision for Mr. Chapin to see and visit his son under certain restrictions. In March, 1931, Mrs. Chapin was married to Willard F. Cummings, with whom she and Huntley Chapin Jr., lived at that time in Chicago, and later in Atlanta, and still later in Tampa, Florida, where Mrs. Cummings died in August, 1939. During this period Mr. Chapin married again, and has lived in different parts of the country. He visited the child under the provisions of the decree, at certain times during 1933 and 1934, in Chicago. He made the payments for the support of Huntley Chapin Jr., as required by the decree, and in 1939 the decree was modified by consent of the parties to provide that he should thereafter pay the sum of $13,800 in monthly instalments of $100. These payments were made until Mrs. Cummings' death. Mr. Chapin was then living with his wife in Los Angeles, California, and upon learning of the death he tried by telephone and by mail to communicate with Mr. Cummings, who refused to talk with him, or to receive his communications. Chapin came to Georgia and instituted the present habeas-corpus proceeding to obtain the custody of his child. Cummings, after Mrs. Cummings' death, had returned to Atlanta with the child in his custody. The record shows that a son was born to Mr. and Mrs. Cummings, and that Huntley Chapin Jr. had been brought up with the other boy in their home, in the belief that he was the son of Mr. Cummings, and without knowledge of his own father. There was evidence that a short time before the hearing the child was told of his real father. Cummings resisted the application, and sought to show that he was entitled to the custody of the child, and that it would be to the child's best interests to be retained and brought up by him. At the time of the hearing Cum-

mings lived in an apartment in Atlanta with these two boys, and near the apartment lived some of Mr. and Mrs. Cummings' relatives, who, it was contended, were assisting in looking after the bringing up of their children.

There was no question as to the character or fitness of the father or as to his financial ability to meet his obligations in reference to providing for the child, who at the time of the hearing was about ten and a half years of age. There was conflicting evidence with reference to the fitness and ability of the respondent to discharge these obligations; but there was sufficient favorable testimony in this respect to authorize the judge to find that Cummings was a suitable person to have the care of the child if he was otherwise entitled to the custody. The judge awarded the custody of the child to Cummings, and this judgment is under review. It is insisted on the one hand that the award was erroneous and should be reversed, because the claim of the natural father should be respected, unless he had forfeited it in some way, or unless it was found that he was an unfit person to discharge the parental duties and obligations. On the other hand, it is contended in support of the judgment that the matter was in the discretion of the judge, who should consider the interests of the child as paramount; and that no abuse of discretion is shown. We may begin our consideration of the question by observing that in normal circumstances custody of minor children is with their parents, without right in any one to disturb or interfere. This is true in the nature of things, and accords with all of the highest aims of society. In such normal situation the father, under the law, is made responsible for the care, support, and maintenance of his children. The father if living, and then the mother, is the natural guardian of minor children. Code, § 49-102. When this normal relation is disturbed and divorce intervenes, we find in our State the following provision with respect to the custody of children: "In all cases of divorce granted, the party not in default shall be entitled to the custody of the minor children of the marriage. The court, however, in the exercise of a sound discretion, may look into all the circumstances, and, after hearing both parties, make a different disposition of the children, withdrawing them from the custody of either or both parties, and placing them, if necessary, in possession of guardians appointed by the ordinary. The court may exercise a similar dis-

cretion pending the application for divorce." Code, § 30-127.

Upon the severance of this normal relation by the intervention of death, there is this further provision: "Upon the death of the father, the mother is entitled to the possession of the child until his arrival at such age that his education requires the guardian to take possession of him. In cases of separation of the parents, or of the death of one and the subsequent marriage of the survivor, the court, upon writ of habeas corpus, may exercise a discretion as to the possession of the child, looking solely to his interest and welfare." Code, § 74-106. There are other provisions for delinquent children. By § 74-110 children under twelve years of age may, under certain circumstances, for their protection, be placed under the care of certain institutions or under a suitable guardian.

In the case before us custody of the minor child was awarded to the mother by the divorce decree when he was about eighteen months of age. The next step of the inquiry then, it seems, should be as to what effect, if any, on the status of the child and his custody did the death of his mother have. The answer here clearly seems to be that the right of custody was by this event restored to the father prima facie, and would stand on the same footing as if the mother had died before any divorce had been granted. Of course, in making this statement we are dealing merely with the legal relation, and are not presently taking into consideration any practical circumstances which might or might not in a given case justify the court in interfering with such a legal right. The fact that the mother had been awarded the custody of the child under the Illinois divorce decree does not, of itself, alter the status of the case where she has died. See Leclerc v. Leclerc, 85 N. H. 125 (155 Atl. 249 , 74 A. L. R. 1348): "Upon the death of the parent who has held custody under a divorce decree, the right to custody automatically enures to the surviving parent." 74 A. L. R. 1353; Taylor v. Jeter, 33 Ga. 195 (81 Am. D. 202). The natural rights of a father are not annuled by a provision in a divorce decree awarding custody of the child to the mother, but they are only suspended for the time being, and are revived in full force upon the mother's death. See Re Hollinger, 90 Kan. 77 (132 Pac. 1181). "The prevailing rule is that upon the death of one of the parties divorced by judicial decree the divorce proceeding fails so far as concerns any further right to the custody of the child." See 74 A. L. R. 1357, and cit.

In *Girtman* v. *Girtman,* 191 *Ga.* 173 (11 S. E. 2d, 782), this court said: "On the death of the parent who holds custody of a child under a divorce decree, the right to the custody automatically enures to the surviving parent." The respondent as the child's stepfather had no legal control of him. *Rusher* v. *State,* 6 *Ga. App.* 786 (65 S. E. 800). "A stepfather is not under a legal duty to support minor stepchildren. *Brown* v. *Sockwell,* 26 *Ga.* 380 (3); *Swain* v. *Stewart,* 98 *Ga.* 366 (3), 369 (25 S. E. 831); *Marshall* v. *Macon Sash, Door & Lumber Co.,* 103 *Ga.* 725 (30 S. E. 571, 41 L. R. A. 211, 68 Am. St. R. 140); *Wood* v. *Wood,* 166 *Ga.* 519 (5) (143 S. E. 770). 'Until majority, it is the duty of the father to provide for the maintenance, protection, and education of his child.' Code, § 74-105. Upon the death of the father, the duty of supporting dependent minor children falls upon the mother. *Swain* v. *Stewart,* supra; *Ellis* v. *Hewitt,* 15 *Ga. App.* 693 (84 S. E. 185); 20 R. C. L. 635, § 40. When the mother marries again . . . the liability of the mother to support her minor children by the former marriage is not changed, and the children must look to their mother, and not to their stepfather, for support." *Edwards* v. *Addison,* 187 *Ga.* 756 (2 S. E. 2d, 77).

This brings us to the status of the case as the law fixed it at the time the trial judge undertook its consideration. It does not seem to be contended that the father in the present case had lost control of his child by any of the methods stated by the Code, § 74-108, nor do we think it could be. He had not abandoned the child. Recognizing the award of his custody to his mother during her lifetime, he had continued in the discharge of his obligation for the child's support. See, in this connection, *McComas* v. *Glendenning,* 59 *Ga. App.* 235 (200 S. E. 304); *Glendenning* v. *McComas,* 188 *Ga.* 345 (3 S. E. 2d, 562). We have seen from the Code sections that the court may, in a proper case, where the welfare of the child requires it, take the custody from either or both of the parents and award it to third persons. We perceive also from these provisions of law, as well as from the cases on the subject which will presently be dealt with, that some reason, and in fact a "clear and strong case," must exist before the court would be justified in disturbing the natural ties between parent and child. The child in those circumstances becomes the ward of the court. But, it must be remembered, he is first a ward of the parent. Before beginning

a consideration of the cases which are relied upon as precedent by the respective parties in the present case, we call attention to a further provision of our Code, § 74-107, as follows: "In all cases where the custody of any minor child or children is involved between the parents, there shall be no prima facie right to the custody of such child or children in the father, but the court hearing such issue of custody may exercise its sound discretion, taking into consideration all the circumstances of the case, as to whose custody such child or children shall be awarded, the duty of the court being in all such cases in exercising such discretion to look to and determine solely what is for the best interest of the child or children, and what will best promote their welfare and happiness, and make award accordingly." This is taken from an enactment of the General Assembly of 1913 (Ga. L. 1913, p. 110), after the decisions which will be discussed.

Our courts have many times had occasion to deal with the perplexing problems which have arisen from domestic discord in the family pattern in reference to custody of children. Two things have been uppermost in their consideration of those problems. One is, as already stated, to preserve the rights of the natural parent where they have not been forfeited, or where they do not come in serious conflict with the best interests of the child. The other is really but a part of the first; and that is that the welfare of the child must be considered as of paramount importance. As the court has sometimes observed, they do not necessarily conflict; indeed, they ordinarily coincide, and the "paramount interest of the child" shall not be taken to mean that the court would in any given contest simply determine where the child might have the better financial, educational, or even moral advantages. Because, if that would be the test, the family ties of blood representing the very fiber and bedrock of our society might be endangered, and the courts called on to become arbiters for social betterment. This was never intended. The function of the court comes into play only for the *protection* of the child—protection from the consequences which misconduct, or failure to provide, or similar acts or omissions on the part of its erring parents may bring about. An exhaustive and profitable review of the cases and writings on the general subject is to be found in *Sloan* v. *Jones,* 130 *Ga.* 836. 847 (62 S. E. 21), and from the opinion of Lumpkin, J., in this case we feel justified in quoting liberally therefrom:

"The right of a father to the custody of his minor child, and the discretionary power of a judge, upon the hearing under a writ of habeas corpus issued at the instance of the wife, to award the custody to a third person, if the welfare of the child so requires, have frequently been the subject of consideration. As early as 1836, in the matter of *Mitchell,* Judge R. M. Charlton, of the superior court, filed an able and elaborate opinion on the subject. In the course of it he made use of the following language: 'The power ought to be exercised in favor of the party having the legal right, unless the circumstances of the case and the precedents established would justify it (the court), acting for the welfare of the child, in refusing its aid. It becomes important, then, to inquire who has the legal right to the custody of this infant; and it seems to me that the answer that would rise to the lips of any one, however unskilled he might be in the science of the law, would be that such right resides in the father. The law of nature, the feelings which God has implanted both in the man and the brute, alike demand that he who is nearest to it, who is the author of its being—who is bound to its maintenance and protection, and answerable to God for the manner in which it is reared, should have its custody, and the law of man, which is founded upon reason, is not hostile to the assertion of this claim. Lord Ellenborough, in the case of the King v. DeManneville (5 East, 223), speaking of the father, says, "He is the person entitled by law to the custody of his child. If he abuse that right, the court will protect the child." . . But notwithstanding this legal right of the father, circumstances may exist which would justify a court, in this proceeding, in refusing to lend its aid to him in procuring the custody of his child, or even withdrawing the infant from his custody, when its morals, its safety, or its interests seem to require it. All legal rights, even those of personal security and liberty, may be forfeited by improper conduct; and so this legal right of the father to the possession of his child must be made subservient to the true interests or safety of the child, and to the duty of the State to protect its citizens of whatever age.' Numerous authorities, both English and American, were cited to sustain the positions announced. *R. M. Charlton,* 493 et seq. That decision was rendered before the organization of the Supreme Court, but it has been cited several times by this court. It arose on a writ of habeas corpus issued at the instance of Mitchell, the father of the

boy whose custody was in controversy, against the child's maternal grandfather, in whose house it was born and had remained, with the father's consent, for some three months, up to the time of the issuance of the writ, the mother having died in childbed. It was contended that the father had promised his wife on her deathbed that the child should remain with her parents during its infancy, though this was denied by him.

"In *Miller* v. *Wallace, 76 Ga.* 479 (2 Am. St. R. 48), Mr. Justice Hall, as the organ of the court, delivered a full and carefully prepared opinion touching the subject now before us, in which he reviewed and discussed various earlier decisions, including those of *Mitchell,* R. M. C., 493; *Boyd* v. *Glass, 34 Ga.* 253 (89 Am. D. 252); *Taylor* v. *Jeter, 33 Ga.* 195 (81 Am. D. 202); *Bently* v. *Terry,* 59 *Ga.* 555 (27 Am. R. 399); *Janes* v. *Cleghorn,* 54 *Ga.* 9, s. c. 68 *Ga.* 87; *Smith* v. *Bragg,* 68 *Ga.* 650; *Lindsey* v. *Lindsey,* 14 *Ga.* 657. After stating that it is indisputable that the father, under the law, has the control of his minor child, and that this can be relinquished or forfeited only in one of the modes recognized by the law, and that it is equally clear that in writs of habeas corpus, sued out on account of the detention of a child, the court, on hearing all the facts, may exercise its discretion, as to the person to whom the custody of the child shall be given, and shall have power to give such custody to a third person (Civil Code, § 2453), he declared that 'The discretion to be exercised in such case is not an arbitrary and unlimited discretion like that confided to the Roman prætors, but, as remarked by Lord Mansfield in R. *v.* Wilkes, 4 Burr. 2527, is such a "discretion as, when applied to a court of justice, means sound discretion guided by law."' Again he said: 'The rule of discretion, as applicable to habeas corpus cases, did not originate with the compilers of our Code; they took it from the common law, and in adopting it they adopted also the meaning and limitations placed upon it by the venerable sages and authorized expounders of that noble system. Under the "discretion" vested in him, no judge has authority to disregard or even to impair any acknowledged or established right of a party by its exercise; and if he does so, it would seem to follow, as a necessary consequence, that he abuses that discretion. . . Prima facie, the right of custody of an infant is in the father, and when this right is resisted, upon the ground of his unfitness for the trust or other cause, a proper re-

gard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. . . The discretion to be exercised by the courts in such contests is not arbitrary. The rights of the father, on the one hand, and the permanent interest and welfare of the infant, on the other, are both to be regarded, but the right of the father is paramount, and should not be disregarded, except for grave cause. The breaking of the tie that binds them to each other can never be justified without the most solid and substantial reasons, established by plain proof. In any form of proceeding, the sundering of such ties should always be approached by courts "with great caution and with a deep sense of responsibility."' That case was a controversy between the father of a female child four years old and the maternal grandparents. It appeared that the child's mother shortly before her death stated that she wished her mother to take, care for, and raise the child, and for a time the father allowed the child to remain with her grandparents.

"In *Taylor* v. *Jeter,* supra, Jenkins, Judge, said (p. 203) : 'Had the respondent to the habeas corpus intended to rely upon the ground of unfitness for the office in the applicant, the latter should have been notified of it by a distinct allegation in the answer, and there should have been direct, satisfactory proof adduced to sustain it.'

"In *Monk* v. *McDaniel,* 116 *Ga.* 108 (42 S. E. 360), it was held, that 'While the judge upon the hearing of a writ of habeas corpus for the detention of a child is vested with a discretion in determining to whom its custody shall be given, such discretion should be governed by the rules of law and be exercised in favor of the party having the legal right, unless the evidence shows that the interest and welfare of the child justify the judge in awarding its custody to another.' The decision in *Miller* v. *Wallace,* supra, was cited and approved. In *Lamar* v. *Harris,* 117 *Ga.* 993 (44 S. E. 866), Mr. Justice Candler said (p. 997) : 'The law does not fly in the face of nature, but rather seeks to act in harmony with it, and to that end encourages the formation and continuance of those ties which, by the inscrutable providence of God, bind man to his own flesh.' In *Looney* v. *Martin,* 123 *Ga.* 209 (51 S. E. 304), the same Justice, in delivering the opinion, again approved this statement. These two cases turned on a contention that the father had re-

linquished his parental control; and it was held that there must be clear proof to authorize the disregarding of the father's right. See also *Carter* v. *Brett,* 116 *Ga.* 114 (42 S. E. 348); *Richards* v. *McHan,* 129 *Ga.* 275 (58 S. E. 839).

"In *Williams* v. *Crosby,* 118 *Ga.* 296 (45 S. E. 282), Mr. Justice Lamar said: 'In a contest between two parties, both of whom are fit and proper persons, the one having the legal right should prevail. If both are proper parties, but neither has a legal right, the one having the strongest moral claim should prevail. But in every case, regardless of the parties, the welfare of the child is the controlling and important fact. This is not intended to nullify the laws of nature; for in most instances it will be found that the legal right of the parent and the interest of the child are the same. But if through misconduct or other circumstances it appears that the case is exceptional, and that the welfare of the child requires that it should be separated even from its parent, the parens patriæ must protect the helpless and the innocent. They are the wards of the court, the hope of the State, and the seed-corn of the future.' This was said in a case involving a controversy over the custody of a child between its parents, who had been divorced. The judgment in the divorce suit awarded the child to the mother. The court, on the hearing of the habeas-corpus proceeding, apparently thought that the judgment in the divorce case prevented him from entering into the question as to the fitness of the parent or the interest of the child, even on evidence as to these matters since the decree, and the language quoted was used in discussing this ruling.

"It will thus be seen that prima facie the right to the custody of an infant is generally in the father, if living; but that this may be resisted on the ground of unfitness for the trust, or other good cause; and that, in reaching his judgment on a habeas-corpus proceeding involving the custody of the minor child, the presiding judge should award the custody to the person legally entitled thereto, unless it is made to appear that he has lost this right, or that the security, morals, or welfare and interest of the child require another disposition; and that the right of the father should not be disregarded and his child awarded to the custody of one neither the father nor mother (even though a grandparent) save for grave and substantial cause. The rights of nature are not to be

lightly overridden on the one hand, nor is the welfare of the child to be disregarded on the other."

Although in *Proctor* v. *Proctor,* 164 *Ga.* 721 (139 S. E. 531), attention was called to the fact that *Sloan* v. *Jones,* from which we have liberally quoted, and *Miller* v. *Wallace,* dealt with in the *Sloan* case, were rendered before the passage of the act of 1913 (Code, § 74-107), we do not consider that the law as announced in those cases has been changed by the act of 1913, in a controversy between a natural father and a stepfather (who, in law, is a stranger to the child) over custody. It will be noted that the act of 1913 seems on its face to apply only to a case of custody of a child *between parents*. In the *Proctor* case, supra, the proceeding was between parents, although the custody of the child was finally made to the child's maternal grandfather. It was ever the law that it is "the duty of the court . . in all such cases in exercising such discretion to look to and determine solely what is for the best interest of the child." Before the act of 1913, in a contest between father and mother over the custody of their minor child the prima facie right to custody was in the father. This was deemed to the best interest of the child, and a strong case to the contrary was required in order to justify the judge in refusing to award the child to the father. Since that act there is in such case no such rule of prima facie right to custody in the father, and both parties must show that the welfare of the child will be best served by an award of the child to his or her custody, and in making up his decision in such case the judge is vested with a discretion that is no longer restricted by the rule above mentioned. It is not to be presumed that the General Assembly meant to totally repeal, in respect to habeas-corpus cases, the provision of the Code, § 74-108, "Until majority, the child shall remain under the control of the father," etc., especially as between a father and the stepfather. See *Butts* v. *Griffith,* 189 *Ga.* 296 (2) (5 S. E. 2d, 907) ; *Fowler* v. *Fowler,* 190 *Ga.* 453 (9 S. E. 2d, 760). Aside from this, it may be stated, both upon principle and upon authority of the precedents herein referred to, that where it appears that the father is a fit person to care for his child, and no voluntary relinquishment of his right appears, and there are no other circumstances pointing to serious concern as to the future of the child in the father's custody, it should follow, in the absence of a strong showing to the contrary,

that the welfare and best interest of the child will be best served by his being in the custody of his own father.

Added strength to the principles appearing in the above discussion may well be found in one of the earlier cases, where, in discussing rights as to preference in a guardianship, Judge Lochrane, in *Johnson* v. *Kelly*, 44 *Ga.* 485, made the following interesting, and we think important, statement: "Judges have had great embarrassment in the decision of questions involving the rights to custody of children, and the rule of looking to the best interest of the child in the selection of guardians, even with the wisest jurists, has turned out unfortunately. It is hard to set up a discretion which will stand the test. But the law wisely makes *blood* relationship or kin the test, and those who stand closest to the ward are to have the preference, not that one not so near who may be wealthier, more intelligent or educated, shall have it from these advantages. *The law, in the long run, trusts to blood, if those nearest are unobjectionable.* And the law trusts wisely. Argyle's love of the Tartan was cherished far from the Scottish coast; how much stronger the love of *blood* relationship? *When, in the sunshine of life, all may run smooth, but while troubles gather they bring selfish aims to life. Against changes and vicissitudes of either fortune or time the truest anchor of reliance is blood; for the ties of affection, cemented by a common ancestry, scarcely ever snap or fly asunder when sickness invokes sympathy or poverty pleads for aid.* Therefore the principle is a wise one, and ought to be enforced in its terms without bringing *discretion* to operate in setting aside the law upon the part of the 'ordinary.' The cases in which, if necessary, he may grant letters to a stranger in blood, are cases that do not fall within the principle of collaterals applying who are unobjectionable."

The case of *Fletcher* v. *Bragdon*, 150 *Ga.* 575 (104 S. E. 223), is strongly relied upon by the defendant in error, as is also the case of *Brooks* v. *Isabel*, 150 *Ga.* 727 (105 S. E. 483). There was no opinion in the *Brooks* case. In the headnote in the *Fletcher* case the court held: "Under the evidence submitted it does not appear that the trial judge abused his discretion in awarding the custody to the respondents." The petitioner in that case was the father and the respondents were the child's grandparents. Judge Beck stated, in his recital of the facts, that the court expressly found

that the father was a man of fit character to have the custody and care and rearing of the child; and therefore it is difficult to reconcile the holding referred to with the views expressed above, and with the previous cases on the question. There were some distinguishable facts, such as failure of the father in that case, for a long period of time, to support the child. These facts and others may have been considered by the court sufficient, even under the rule we here follow, to authorize the judgment; but at any event the decision was not by a full bench, Justice Gilbert dissenting. We yield to the holdings in the older cases. We are not only bound by them, but are refreshed in the belief that they state a correct and sound principle.

In *Brooks* v. *Isabel,* supra, there was a similar holding that the trial court had not abused its discretion in awarding the custody of the minor child to the maternal grandparents; but in that case there was evidence of ill-treatment and neglect by the father, and it is recited that "The trial judge, in deciding the case, was of the opinion, that, if the plaintiff had not forfeited his right to the custody by failure and refusal to contribute to the support of the child for about eight years, it was for the best interest of the child, in view of all the facts and circumstances, that she be placed in the custody of her maternal grandparents." The decision in *Walker* v. *Jones,* 1 *Ga. App.* 70 (57 S. E. 903), also relied on by counsel for the stepfather, is not in conflict with our ruling. That was a habeas-corpus proceeding by the father against the maternal uncle and maternal grandmother of the child. The mother was dead, having been divorced from the plaintiff, and the custody of the child awarded to her. She had left the child with the defendants. The trial court awarded the custody of the child to the father, reciting in his order, in substance and effect, that he felt himself bound to do so as a matter of law. The judgment was reversed on the theory that under the evidence the judge was vested with a discretion, which, it appeared from his order, he had not exercised. Of course this ruling was necessarily one that the judge would have been authorized to refuse to award the father the custody of the child, but there was abundant evidence tending to show that the father was unfit to have the custody of the child. The father "had been convicted, in May, 1905, of gaming and of running a gaming-house (chain-gang sentences of twelve months each

in these cases being suspended during good behavior) ; his name had been publicly associated with that of a prostitute; even by his own admissions his conduct had not been chaste; he had been conducting a pool-room for betting on horse races; and the nearest approach he is shown to have made in recent years toward having a fair and reputable means of a livelihood was that at the time of the trial he was employed as the agent of a man who ran a turf exchange in Birmingham." In the present case there was no evidence to indicate that the plaintiff was unfit to have the custody of his child. Judge Powell, in delivering the opinion of the court, said that while it is not necessary to show the unfitness of the father by "overwhelming evidence," it is necessary "to sustain the objection to the father's prima facie right to the custody, . . that the proof be clear and satisfactory, and that a strong case be made out."

In the present case we have the situation of a man whose own child, his first born, a manchild, who was christened in the full name of his father to the very point of having appended to his name a "Junior" so common, as a manifestation of man's pride in his own creation, has been awarded in custody in his infancy to the child's mother, where he remains for the greater part of the time and with his stepfather, until he is ten and a half years of age. The mother dies. The boy is, by this circumstance, left in the temporary custody of his stepfather. He has, throughout this period been fully supported and financially provided for by his own natural father, who seeks promptly upon the death of the child's mother to regain his child. We think it not amiss to say that the father at least acted naturally in so moving. Of course, in a proper case the father, as we have seen, could be denied this custody, even in favor of strangers. In the present case the stepfather had acquired no rights with reference to the child. The custody had been his wife's, not his. The duty to support the child had been cast by law and by the divorce decree and judgment upon the child's father, not upon the stepfather. The evidence showed, without dispute, that the child's father was amply able to support him as he had previously, that he had an established home in which he could take him, offer him favorable advantages in life; and while this affirmative showing may not have been necessary, it appeared in the record that these facts were verified by the neighbors and

associates of the father. The mere fact that awarding custody to the father would remove the child to another State, and to new associations, we do not consider sufficient to authorize the court to make its own award. Who knows the future fortunes of any child? In the absence of a "clear and strong case" to the contrary, we think that the hand of the court is under the restraint of a plan divine, and that the learned trial judge, trying as he earnestly did to achieve the best results, committed error, and that his judgment should be *Reversed. All the Justices concur.*