1. On the death of the parent who holds custody of a child under a divorce decree, the prima facie right to the custody automatically inures to the surviving parent. Landrum v.Landrum, 159 Ga. 324 (125 S.E. 832. 38 A.L.R. 217);Girtman v. Girtman. 191 Ga. 173 (11 S.E.2d 782);Chapin v. Cummings, 191 Ga. 408 (12 S.E.2d 312).
2. Under the Code, § 74-108(3), the right to parental control and custody may be lost by the father by failure to provide necessaries for his child. However, in order to sustain a contention that the father has lost his right to custody by reason of failure to provide necessaries, a clear and strong case must be made. Miller v. Wallace, 76 Ga. 479
(2 Am. St. R. 48); Sloan v. Jones, 130 Ga. 836 (62 S.E. 21).
3. In the instant case the decree of divorce giving custody of the infant boy to the mother provided that the father should pay $20 per month for his support. and that upon his reaching the age of three and a half years application might be made to the court for further order with reference to his custody. The mother, who lived with her parents, died when the child was about two years old. The father was at that time in arrears on the payments for the support of the child; but there was evidence that he was unable to make the payments, because of being sick and unemployed. He allowed the child's grandparents to retain and care for him for almost two years before instituting the present proceedings to obtain custody. During this time he visited the child, but contributed nothing to his support, except occasional gifts of clothing, although the father was gainfully employed. It did not appear that the grandparents made any demand that the father contribute to the support of the child. On the contrary it appears that they willingly cared for him, hoping to be able to obtain the permanent custody. While this evidence discloses that the father allowed the grandparents to retain custody of the child after the death of their daughter and only child, and to bear financial burdens which were primarily his, it was not sufficient to demand a finding that the father had lost his prima facie right to custody by failure to provide necessaries.
4. The evidence being sufficient to authorize a finding that the father was financially able and a morally proper person to have the custody of the child, the court did not err in awarding the custody to him.
Judgment affirmed. All the Justicesconcur.
 No. 13662. APRIL 16, 1941. *Page 44 
By the terms of a consent order which was made a part of the final decree of divorce entered on May 14, 1937, in the case of Mrs. George W. Newsome Jr. v. George W. Newsome Jr., custody of the six-months-old son of the parties was awarded to the mother until he should attain the age of three and a half years, at which time application might be made for further order of the court with reference to the custody, but in the absence of such application the mother should retain custody. The order further provided that the father should have the right of reasonable visitation, and should pay $20 per month for the support and maintenance of the child and $25 attorney's fee. Mrs. Newsome resided with her parents, Mr. and Mrs. J. C. Brown, until she died on October 1, 1938, as the result of injuries sustained in an automobile accident. After the death of the mother, the child remained in the care of Mrs. and Mrs. Brown. On September 24, 1940, George W. Newsome Jr. filed a summary motion in connection with the divorce action referred to above, praying for custody of his child, and for issuance of a rule nisi requiring Mr. and Mrs. Brown to produce the child in court and show cause why the custody should not be awarded to the movant. Mr. and Mrs. Brown submitted to the jurisdiction of the court, and sought to retain the custody of the child and to have their right thereto confirmed. The court, after a hearing, entered a decree awarding custody of the child to the father, and the grandparents excepted.
Several witnesses testified to the good reputation of the father. He testified, in part, as follows: He was twenty-two years of age when he came to Atlanta from his home in Hawkinsville, to obtain employment in January, 1936. He took up residence with an aunt in a boarding-house on Peachtree Street. Mr. and Mrs. Brown and their only child, a daughter of sixteen years, also resided in the boarding-house. He and Zella, the daughter, began to go together with the approval of her parents, and shortly thereafter were married. Mr. and Mrs. Brown voiced no objection to the marriage. On the contrary, while he was on a honeymoon trip with Zella, the Browns moved his things from his boarding-house to the apartment where they were then living. There he lived happily with his wife until some time after a child was born in October, *Page 45 
1936. He paid no board, because Mr. Brown told him he did not expect him to. Mr. Brown told him to save his money instead, and this he did by giving his wife $20 of his $25 weekly salary, for the purpose of buying her lunches and making a deposit of the balance in a bank. On November 18, 1936, he lost his job because of a strike in the plant where he worked, and he was unable to obtain steady employment again until February, 1937. Shortly before Christmas, 1936, Zella went to Florida to recuperate from childbirth, or so he was told. He had only $25 in the bank at the time, but he gave her $20 for this purpose. After she had gone, Mrs. Brown told him that Zella had gone to Florida for the purpose of deciding whether she would continue to live with him. This was the first intimation he had that everything was not all right between them. However, previously Zella had invited into their home for a card game a young man with whom she had had dates before her marriage. He resented this, and especially did not like the unfavorable comparisons which his wife made between his card-playing and that of the other young man. This aroused some controversy, and Mrs. Brown insisted that her daughter should have any one she wished to visit in the home, and expressed the determination that her daughter should have dates with other young men. Zella remained in Florida for about ten days, and upon her return expressed the determination not to live with him any longer. He did not wish to live with her against her will, and they separated. He did not contest the divorce proceeding which his wife instituted, and consented to her taking custody of the boy because he was not equipped to take care of him. In pursuance of the divorce decree he had paid about $200 for support of the boy when his mother died in October, 1938. No payment was made thereafter, although he made gifts of clothing at various times. He has never paid the $25 attorney's fee, although he was ruled in contempt of court for failure to do so. He did not pay this because he was assured that attorney's fee would be taken care of if he would not contest the divorce. In December, 1937, he lost his job in Atlanta. Due to employment conditions he was "rolled" in favor of some one higher on the seniority list. He went to Florida in January, and held a job for a month before going to Bristol, Tennessee, to take a better job. He soon became sick and had to give up his job and return to Atlanta. He was sick and unable to *Page 46 
work for six months, because of a heart trouble. Until his sickness he made regular payments toward the support of his child. Soon after the death of his divorced wife he was able to go to work again, and obtained employment with Downtown Chevrolet at $20 per week. He worked there until about four months before the hearing, when he took a job with Mitchell Motors, making $35 per week and certain small commissions on the sale of automobile accessories. Although he made no payment to the support of his child after he was able to resume working, he continued to visit the child and to take him out on Saturday and Sunday afternoons. The Browns never denied him the right to see his child, but he felt that they were not fully co-operative. They found various reasons for not allowing him to see or take the child out. Sometimes it was because the child had a cold, or he had gone to bed, or was in a nursery school, or they had other plans for him. The plaintiff has married again, and is now able to take care of and provide a good home for his child. His wife is very anxious for them to have custody of the child. She also has a job, and they have made arrangements to have a relative of his to come to their apartment and look after the child while they are at work. He sought to get the Browns to allow him to have his son after he remarried, but they refused, and he instituted the instant proceeding for the custody. He is able and willing to reimburse the Browns for all reasonable expenses which they have incurred in caring for the child after he became sick and unable to continue making payments for the child's support. He has had to pay off large bills which he accumulated during his illness.
The respondents introduced evidence to show that they were financially able and proper persons to be entrusted with the care of the child. Mr. Brown is fifty-four years old and Mrs. Brown is forty-eight. Mr. Brown admitted that Newsome had always acted like a gentleman toward his daughter in his presence, and that he never knew of any alleged cruelty to her until after the separation, when he was told of the cruelty which was the basis of the divorce suit. He testified that his daughter told Newsome, before she went on her trip to Florida, that she would not live with him. Mr. and Mrs. Brown testified that they allowed Newsome to see his child whenever he desired, but that he did not visit him or inquire about him more than once a month, and sometimes even *Page 47 
less. Mrs. Brown supported her testimony with a memorandum containing the dates of the visits and calls made by Newsome after the death of the child's mother, and the particulars concerning each. She testified that she had kept this memorandum upon advice given to her by her attorney soon after the death of her daughter, "with designs on keeping the child." She refused to say that Newsome was not a fit and proper person to take care of his child. The respondents introduced the depositions of Mrs. Newsome, taken in connection with and used upon the trial of the divorce suit. In rebuttal, Newsome denied the charges of cruelty made in the deposition. It appeared from the evidence that Mr. Brown paid the doctor bill incidental to the birth of the child, although an attempt had been made to get Newsome to pay it. The record contains a citation for contempt against Newsome, filed in June, 1937, for failure to pay $25 attorney's fee and one monthly installment toward the support of his child. On June 29, 1937, he was adjudged in contempt, but allowed to purge himself by paying the alimony by July 3 and the attorney's fee not later than July 31, 1937.
A large part of the evidence dealt with facts touching the marriage of movant and Zella Brown. No attempt has been made to state these facts, because they throw little, if any, light upon the question involved, and would not demand a finding contrary to that made by the judge.