## A89A1726. BROOKS v. CARSON.
(390 SE2d 859)

BIRDSONG, Judge.

This is an interlocutory appeal in a child custody action filed in January 1989 by the child's natural father against the natural mother. A third party, apparently not a relative of either parent, filed a motion to be allowed to intervene as a party defendant for the asserted express purpose of terminating the father's paternal rights and obtaining custody, by challenging his fitness and promoting the best interests of the child.

The intervenor, Mary Carson, contended the natural mother had given her custody of the child by a "transfer of custody agreement" dated August 28, 1986, and that she had had physical custody of the child for three years and had supplied the child with a warm home place; that the child "does not know the [natural father] and is very fearful of living with him," and, as presently situated with Mary Carson, is an excellent student and has a very happy disposition.

Carson averred further that the plaintiff natural father (Michael Brooks) was unfit to raise the child; that he "is presently the stepfather of four children and doesn't even have a telephone and therefore is financially unable to care for the needs of said minor child."

Carson contemporaneously filed a "proposed intervenor answer and counterclaim" to the father's suit against the mother, asserting that the father had wilfully abandoned the child for over one year preceding the filing of his complaint, and further that she (Carson) "is informed and believes that the [p]laintiff is a substance abuser and has in fact sniffed transmission additives in the past in order to satisfy his need for a 'high.' " Her proposed prayer sought, inter alia, termination of the father's parental rights, dismissal of the father's custody suit, and the award of physical and legal custody to herself.

Carson also tendered interrogatories to the father, questioning his previous contacts with the child, the names and ages of his stepchildren and wife, the identity and addresses of all his local rela-

tives, and inquiring into his driving record and as to whether he had ever been charged with or convicted of a crime.

Carson proposed three requests for admission, to-wit: "1. Do you admit or deny that you have not visited with [the child] since August 28, 1986 [the date the mother transferred custody to Carson]? (2) Do you admit or deny that you have not communicated or visited with [the child] for one year preceding the filing of your complaint. (3) Do you admit or deny that you have sniffed 'transmission-go' in the past."

The trial court granted third-party Carson's motion to intervene as defendant, and subsequently, "[b]ased upon the fact that the [father] has not provided support for the minor child . . . for three (3) years or more," denied the father's motion for reconsideration. *Held*:

1. The question arises whether this appeal is timely, because appellant-father did not seek a certificate of immediate review after the trial court's order of intervention executed February 16 and filed February 20, 1989, but did so only after the denial of his March 16 "Motion for Reconsideration of Judgment" (which motion would not ordinarily toll the time for appeal).

We find our appellate jurisdiction to be proper in this case. Appellant's so-called "Motion for Reconsideration" was in substance and procedure actually a *motion to dismiss the third-party intervenor for lack of standing.* See *American Mut. Liability Ins. Co. v. Moore*, 120 Ga. App. 624 (171 SE2d 751). He timely obtained a certificate of immediate review to its denial, and filed his appeal petition "pursuant to OCGA § 5-6-34 (b)," which is the interlocutory appeal statute. The case clearly is one for interlocutory appeal, and therefore his mere misnaming of it as "discretionary" does not affect his stature in this court.

Except for giving his pleadings the wrong names, appellant-father proceeded properly and timely to vacate and appeal the order allowing Mary Carson to intervene in appellant's suit against the mother. There is no magic in nomenclature; we construe pleadings properly filed to serve the best interests of justice, and to reflect their true function and intent. See *Frost v. Frost*, 235 Ga. 672, 674 (1) (221 SE2d 567).

As far as the record shows, Ms. Carson herself, without any notice to appellant, prepared the order to intervene and had the trial court execute it ex parte on February 16, only 22 days after the father sued the mother. The record does not show that Ms. Carson ever served a motion to intervene upon appellant prior to obtaining the intervention order ex parte, nor does it appear she served any of the voluminous "proposed" pleadings seeking to terminate his parental rights, except her three-question interlocutories. The record indicates appellant did not even know Mary Carson had, on February 16, made

herself a party to his suit against his child's mother.

Carson filed a lengthy "Notice to Produce," which she certified as having served on appellant on February 26. At this point, appellant must have hied himself to the courthouse to find out why Ms. Carson was taking such a commanding interest in his suit against the mother.

The ex parte order to intervene was improper and should have been vacated. *Gregory v. Tench*, 138 Ga. App. 219 (225 SE2d 753). Shortly after appellant found out about it, he properly moved to vacate it by expressly seeking a dismissal of Carson for lack of standing, but called his pleading a "Motion for Reconsideration." His talent for calling things by the wrong name causes much confusion, but his instincts as to the substance of what he was doing stand him well. There was in fact nothing to "reconsider," for no legal judgment had ever been "considered"; but Brooks acted correctly in seeking to vacate the order and dismiss Ms. Carson for lack of standing. The trial court's denial of appellant's misnamed motion seeking to dismiss Carson was timely followed by a certificate of immediate review, and appellant timely sought appeal of it "pursuant to § 5-6-34 (b)." Jurisdiction of this case is thus properly lodged in this court by interlocutory appeal.

2. We reverse in part and affirm in part. The trial court was statutorily required to make Ms. Carson a "party," but not for the purposes she proposes.

OCGA § 19-9-50 requires Ms. Carson to be made a *party* to the father's suit because she has physical custody of the child. The object of that slim codal provision seems to be mainly to ensure the physical custodian produces the child to the court. See OCGA § 19-9-51 (a). The Child Custody Intrastate Jurisdiction Act, of which the cited code sections are a part, is to be construed to facilitate its general purpose, which is to eradicate intrastate jurisdictional disputes and conflicts and avoid abductions and the "shifting of children from county to county." OCGA § 19-9-21 (a) (1). The Act is to be construed in concert with existing law. *Gambrell v. Gambrell*, 246 Ga. 516 (272 SE2d 70). Nothing in it can increase the substantive rights of any person. Beyond the narrow provision for joinder as a "party" at § 19-9-50, neither the Georgia Code nor any Georgia case law *expressly and intentionally* gives a third party who is not a relative the right or power to instigate a challenge to the right of a natural parent of the child, if such parent has not lost custody by one of the means established in OCGA § 19-7-1 or OCGA § 19-7-4. We conclude that, although § 19-9-50 requires Ms. Carson to be made a "party" because she has physical custody of the child, the father has the prima facie right to custody, and Carson does not have a right to challenge the father's right to custody in favor of herself, or to do anything to promote her own interests and rights, for she has none. But, she may

serve as witness to the only material issue here, viz., the fitness or unfitness of the father as parent; and, she can do that only to the extent she has *direct* knowledge bearing pertinently on his *present* fitness.

It was long ago said that the latter code section (OCGA § 19-7-4) referring to the criteria for abandonment by a parent, must be strictly construed in favor of the parent, being a very harsh provision and "permitting as it does the taking of a child from its parent *at the instance of any citizen,* without regard to the individual right of the applicant." (Emphasis supplied.) *Hammond v. Hammond,* 90 Ga. 527, 530 (16 SE 265). We doubt this statement is entirely true today, or whether it is procedurally correct, or legally and morally proper, to suggest that a child can be taken from its parent by "any citizen."

On the principle of common sense, it is difficult to say persons having the natural concerns of blood and family communion have no place in calling to account an unfit parent of a child sheltered by the family, or whom the family seems to protect. To take such a stand would seem foreign to the precepts of child custody law as far as it seeks to strengthen family stability and accountability.

Therefore, instead of saying a relative has no right to instigate the removal of a child from an unfit parent, the courts have placed such actions under strictest scrutiny. See *Blackburn v. Blackburn,* 249 Ga. 689, 692 (292 SE2d 821). But, it seems clear to us from a review of the cases, that if the law tolerates the natural concern of a relative of the child, it naturally abhors interference between parent and child by third parties who are no relation.

In *Carvalho v. Lewis,* 247 Ga. 94 (274 SE2d 471), which involved a close relation, the Supreme Court held in accord with this court that in a custody dispute between a parent and a third party (a relation), the trial court *must first make a determination as to whether the parent has lost his or her right pursuant to OCGA § 19-7-4 or that the parent is unfit* pursuant to Georgia case law, e.g., *Perkins v. Courson,* 219 Ga. 611 (135 SE2d 388). Having under that restraint impliedly authorized the instigation of the dispute, the Supreme Court tersely held that in such a dispute between a natural parent and a "third party," i.e., a *paternal aunt* in that case, the trial court *could not "compare the relative merits of a parent to those of a third party."* (Emphasis supplied.) *Carvalho,* supra at p. 95.

"A finding of unfitness *must center on the parent alone,* that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. *Chapin v. Cummings,* 191 Ga. 408 (12 SE2d 312) (1940). Only under compelling circumstances

found to exist by clear and convincing proof may a court sever the parent-child custodial relationship. . . . *The ability of a parent to raise his or her child may not be compared to the superior fitness of a third person. That ability must be examined in a scrutinous, abstract light.* Only in custody disputes between parents may a court determine which party is more suitable to be awarded custody, this being the so-called 'best interest of the child' test." (Emphasis supplied.) *Carvalho*, supra at p. 95.

In a case involving the child's *grandmother* as third party, we held: "Where a third party sues the natural, custodial parent to obtain custody of a child and to terminate the parent's custodial rights in the child, *the parent is entitled to custody* unless the third party shows by clear and convincing evidence that the parent is unfit or otherwise not entitled to custody. *Past unfitness, standing alone, is insufficient to terminate the rights of a parent in his child.* Clear and convincing evidence of present unfitness is required." (Emphasis supplied.) *In re A. J. M.*, 169 Ga. App. 477, 478 (313 SE2d 495).

In cases where the third party was not a close relation, the tone of the analysis has become even more relentless. Even where the third party was the government agency charged with primary responsibility in these matters, we have held: "When contemplating taking custody of a minor child from his parent or parents and awarding it to a third party, the court must initially face *the presumption, firmly embedded in our law, that it is in the child's best interest to be with his natural parent or parents.* [Cits.] In order for this presumption to be overcome, there must be a clear and convincing showing that the child is abandoned, deprived, or abused, or that the parent is unfit to receive or retain custody. [Cits.] Thus, in order to take custody from the natural parent or parents and award it to a third party, the court must consider not simply the 'best interest of the child,' which is the appropriate standard when the contest is between parents, [cit.], but the narrower criterion of parental fitness to have the child in his or her custody. [Cits.] Proof of parental unfitness must be clear and convincing. [Cits.] *Evidence adduced to achieve this standard of proof must pertain to present rather than past misconduct.* [Cits.]" *In re M. M. A.*, 166 Ga. App. 620, 622 (305 SE2d 139).

In the case just cited, we also held: "The mere possibility that a child may receive superior influences or amenities in third-party custody is insufficient to justify taking him from his natural parents. *Shover v. DHR*, 155 Ga. App. 38 (270 SE2d 462) (1980). So important have our courts regarded the bond between parent and child that they have declined to sever it in instances of parental conduct far more egregious than [in this case]. . . ." Id. at 624.

"There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to its offspring. *To*

*terminate that right is to sever that right for the future as effectively in law as if it never had existed. It is a tearing of the flesh and it can be done by the court only under the most carefully controlled and regulated circumstances for the sake of the child.* There must be compelling facts to establish the necessary lack of 'proper parental care or control' justifying the government's intrusion in cutting natural family ties." (Emphasis supplied.) *Nix v. Dept. of Human Resources,* 236 Ga. 794, 795 (225 SE2d 306). See also *Carvalho v. Lewis,* supra. To sever parental ties absent such "compelling facts" would be tantamount to child abuse. Id.

" 'The law contemplates that one of the natural parents will be awarded custody of the child unless the present unfitness of the parents is established by clear and convincing evidence at the hearing on permanent custody. *Only then is the trial court authorized to consider an award of custody to third parties.' Childs v. Childs,* [237 Ga. 177 (227 SE2d 49)]." (Emphasis supplied.) *In re M. M. A.,* supra at pp. 624-625.

The foregoing statements from both appellate courts of this state indicate the third party has no place in the determination *until and unless* the parent has been declared unfit. All of what was just quoted was in a case involving the parent's rights versus the Department of Family & Children Services as third party. It seems appropriate to infer, based on all the decisions we have studied, that the farther removed, in terms of relationship, the third party is from the child, the less right that third party has to challenge the natural parent's prima facie right to his child.

In *Drummond v. Fulton County Dept. of Family &c. Svcs.,* 237 Ga. 449, 450-451 (228 SE2d 839), the Supreme Court rather harshly described the posture of foster parents in such a dispute: "The Drummonds . . . urge that any application of the 'best interests of the child' rule necessarily implies some de facto rights arising from the psychological dependency of a parent-child relationship which has been sustained over a period of time. . . . The best interest of the child test has been adopted in many jurisdictions. [Cits.] This rule contemplates a presumption that the best interests of the child lie with the natural parent, but that this presumption may be rebutted by clear and convincing evidence to the contrary. [Cit.] . . . *The Georgia law, however, has not followed this pattern. The best interests of the child test is used only between parents who both have equal right to the child.* [Cits.] *Where the dispute is between a natural parent and a third party, on the other hand, the court must award the custody of the child to the parent unless he has lost his parental prerogatives under [OCGA § 19-7-1] or is unfit.* [Cits.] . . . [Appellants] misconstrue the Georgia law in assuming that the best interests of the child rule applies to foster parents. Without this test

and its focus on the child, there is no basis for recognizing any right in the 'psychological parents.' *Since the focus in determining whether a third party is entitled to custody is on the natural parents and whether or not they have forfeited their rights or are unfit . . . any relationship between the child and his foster parents is primarily irrelevant. Stuckey v. Jones*, 212 Ga. 495 (93 SE2d 719) (1956); *Watkins v. Terrell*, 196 Ga. 651 (27 SE2d 329) (1943)." (Emphasis supplied.)

Again, this language in *Drummond* indicates the third party has no place in the custody matter *until and unless* the parent's rights have been terminated.

Recently, we noted that under some prior cases, in a custody suit initiated by one parent against the other, " '(t)he trial court has the power to award custody to third persons. . . .' [Cits.]" *Mitchell v. Mitchell*, 184 Ga. App. 903, 906 (363 SE2d 159). That case involved an award of permanent custody to the grandparents with visiting rights in the parents, and did not involve a termination of parental rights. But, we reversed the trial court's award of custody to the grandparents because the trial court had used the wrong standard to determine the matter. In remanding, we asseverated (p. 907): "Custody *must* be awarded to one of the natural parents . . . *unless* there is *clear and convincing evidence* that both [parents] are presently unfit. If the trial court . . . cannot find that there is clear and convincing evidence of appellant's *present parental unfitness*, appellant must be awarded custody. That the trial court may be of the opinion that [the grandparents] possess a superior fitness to appellant is immaterial."

Our courts have thus struggled fitfully with some very harsh views of the comparative position of third parties, even close relations, and the rights of natural parents. The uneasy compromise, which is a very strict standard of proof of unfitness, recognizes the natural interest and concern of families in their members, and recognizes and promotes society's strong interest in strengthening those concerns. *But we find no parallel societal interest in a third party who is not bound by the ties of blood and family.* Such a person is a stranger to the child in the eyes of the law. See *Drummond*, supra. The integrity of this principle remains, even if the equities in an individual case seem to differ.

If a third party obtains custody from one parent, it gives her no right and no advantage against the other parent, for one parent cannot contract away custody of the child to a third party in avoidance of the other parent's rights. *Foltz v. Foltz*, 238 Ga. 193 (232 SE2d 66). If she is allowed to compete with the father before the father's rights have been terminated on their own account, inevitably the focus in such a competition would shift from the present fitness of the parent

to the comparative attributes of a legal stranger. Such a debate necessarily clouds the "scrutinous, abstract light" (*Carvalho*, supra at p. 95) in which only the parent's present fitness should be examined, and in which the best interests of the child, as relates to a third party, are irrelevant. *Drummond*, supra.

Under this latter statement from *Drummond*, we do not see what role the third party Carson in this case can have as a party *defendant* in the father's suit against the mother. The mother's agreement to give Carson custody was ineffective as against the father (*Foltz*, supra), and certainly cannot serve to create rights in the third party against him. She is in no better position than the foster parents in *Drummond*. Since the mother seems not to have appeared, the prima facie right to custody is in the father. Custody *must* be awarded to him unless he is presently unfit. *Mitchell*, supra. If OCGA § 19-9-50 requires Carson be made a party, then in view of all the case law (see *Gambrell*, supra), this provision in the context of this case can only be pertinent to ensure that the person with physical custody delivers up the child. The code section cannot enlarge substantive rights she does not have, and it does not give her the right to vie for custody of the child.

The dilemma which has allowed third parties (usually relatives) to instigate disputes over parental fitness, arises from the supposed inadequate resources of appropriate government agencies, or in many cases, from the agency's apparent lack of knowledge of a situation being privately disputed, and where the child is in good care. But we think this "dilemma" is largely imaginary, for the mechanisms clearly exist to permit the agency to set in motion a proceeding for termination of parental rights when such is indicated. When such a terrible, irrevocable thing is contemplated as severing a parent's rights, particularly in favor of a third party who is a stranger in the law, the agency ought to instigate it.

Certainly the agency's involvement provides important safeguards and streamlines any court process. In fact, the trial court here has ordered the agency to make a study of the father's circumstances; it is difficult to see what contribution the third party can make to this endeavor.

If the third party has any knowledge directly pertinent to the only question at issue, i.e., the parent's fitness, she can offer it like any other witness when the issue has properly been raised. Otherwise, it is plain wrong to invite a third party, however well-meaning, to obtain possession of a child, by whatever means, without concurrence of one of the parents, and then herself act to end that parent's rights simply *because* she has obtained physical custody and has inevitably, developed "psychological ties" with the child and perhaps, or most likely, prevented the development of such ties between the parent

and child.

The third party's allegations in this case in support of her claim that the father is unfit, are paradigmatic of the difficulties inherent in these situations: she asserts that the child does not know the father, and is very fearful of living with him. One wonders how, or why, the child is so fearful of living with her father if she does not know him and has not had the opportunity to know him. The third party does not allege here that the father ever abused the child at any time, or that the child has any reason whatsoever to fear him. The question naturally arises, then, as to what the child has been told about her father, or who, in fact, is really fearful of her living with him. Furthermore, the allegation that the father is unfit to raise his own child because he has four stepchildren tends, on the surface, more to indicate that his experience with children is greater, his tolerance and patience long, and his desire to add another child to this large brood is proportionately favorable to him. The allegation that he does not even own a telephone proves nothing. Allegations such as these becloud the issues raised by the father's suit against the mother, and have no place in it. Certainly they do nothing to focus the "abstract, scrutinous light" in which the father's fitness must be examined. See *Carvalho*, supra.

Lastly, we find it important to note, in stating these views, that in a famous case involving reversal of an award to the grandmother (*Blackburn v. Blackburn*, supra), Chief Justice Jordan dissented from the judgment entirely by saying that the grandmother had *no standing* to petition for custody unless and until the natural father's rights had been fully adjudicated. Not only is this view consistent with all our cases which hold (see, e.g., *Carvalho*, supra; *Childs*, supra) that only *after* the parent has been determined unfit can the court turn to a third party, but it also suggests that a third party who is not a relation should have even less standing to raise the issue.

We conclude that although OCGA § 19-9-50 requires that Carson be made a "party" to the father's suit against the mother, this is only because she had physical custody of the child; and she has no standing to petition to terminate the father's rights. She has acquired no rights by virtue of having been given custody by the mother, or by virtue of having developed certain emotional ties after obtaining physical custody of the child. *Drummond*, supra. If she becomes the protagonist in the case, inevitably she acquires certain *procedural* rights which, by illusion, may seem to expand to substantive rights.

As the only question in the father's suit against the mother is resolved by her non-appearance, the prima facie right to custody is in the father. *Blackburn*, supra; *Childs*, supra; *Mitchell*, supra. We do not think the mother's "agreement" to give Carson physical custody has robbed the father of his rights. At this stage, if he is not a fit parent, proceedings to terminate his parental rights should be insti-

gated by the appropriate governmental agency. If the third party has a truly beneficial role to play, it should emerge in the normal course of the proceedings.

As for the trial court's apparent conclusion that the child's interests are inadequately protected if Carson is not allowed to intervene fully as party defendant, we fail to see any evidence that the DFCS in this jurisdiction is not competent to assess and investigate the entire circumstances.

Moreover, the trial court's order to have the DFCS investigate *Carson's* home as well as Mr. Brooks' home, is in error, inasmuch as it implies and indicates directly that the state of her home has any relevance whatever to the question of the father's fitness.

As for the trial court's having denied the father's motion to reconsider Carson's intervention, on grounds that Brooks had not paid child support for three years, it must be emphasized that his failure to pay child support to a third party when the child is in custody of a third party, does not alone authorize a finding of abandonment. *Howell v. Gossett*, 234 Ga. 145, 147 (214 SE2d 882); *Shaddrix v. Womack*, 231 Ga. 628 (203 SE2d 225); *McMillan v. McMillan*, 224 Ga. 790 (164 SE2d 839).

The judgment below is affirmed insofar as it allows Carson to become a party pursuant to OCGA § 19-9-50, but reversed insofar as it permits her to petition to terminate the father's parental rights, and insofar as it permits her to give evidence of her own fitness and of the child's best interests. The suit against the mother must be adjudicated first. If the father is not fit to have the child, his unfitness may be raised by the proper authority or the trial court sua sponte. If any dilemma arises by a refusal of the department to act, we are confident the trial court is competent to resolve the matter in the individual case. But until the father's fitness has been properly adjudicated, the third party Carson has no right to challenge him.

*Judgment affirmed in part and reversed in part and case remanded for proceedings not inconsistent herewith. Deen, P. J., concurs. Sognier, J., concurs in judgment only.*

DECIDED JANUARY 19, 1990 —
REHEARING DENIED FEBRUARY 2, 1990 —

*Betty S. Frazer*, for appellant.
*Brown, Phillips & Scoccimaro, Ralph O. Scoccimaro*, for appellee.